1   IN THE UNITED STATES DISTRICT COURT
2   FOR THE SOUTHERN DISTRICT OF INDIANA
3           INDIANAPOLIS DIVISION
4   CAUSE NO. 1:20-cv-03104-JMS-DML
5
6   LINDA L. STARKE COLSTEN,       )
                                   )
7       Plaintiff,                 )
                                   )
8                                  )
    -vs-                           )
9                                  )
    MUNCIE SANITARY DISTRICT       )
10                                 )
        Defendant.                 )
11
12
13      DEPOSITION OF LINDA L. STARKE COLSTEN
14      The deposition upon oral examination of LINDA
    L. STARKE COLSTEN, a witness produced and sworn
15  before me, Tracy Larimore, RPR, Notary Public in and
    for the County of Allen, State of Indiana, taken on
16  behalf of the Defendant, at the offices of Bose
    McKinney & Evans, LLP, 111 Monument Circle, Suite
17  2700, Indianapolis, Indiana, on the 16th day of
    April, 2021, scheduled to commence at 9:00 a.m.
18  pursuant to the Indiana Rules of Trial Procedure
    with written notice as to time and place thereof.
19
20
21
22
23
24
25

---

Page 14

1   different political parties?
2  A   (Shakes head.)
3  Q   Just political differences on what level?  In
4      other words, because I know you've had some
5      other --
6  A   What they expected me to do and what was allowed
7      by law and what I was and wasn't going to do.
8  Q   Okay.  So give me more details about what was
9      going on.
10 A   At that time period, they expected women to
11     sleep with them, so there you go.
12 Q   That is a problem.  So you have disagreed
13     obviously and --
14 A   Obviously.
15 Q   -- and reasonably on that front.  So did you --
16     you left, and how long were you gone?
17 A   I was only gone from August, like I said, it was
18     either August or September of '77, and then I
19     went back to work because they kept calling me,
20     wanting me to come back to work, and I finally
21     went back in 1978, in July.  July 28th of 1978.
22 Q   Did the board composition change --
23 A   Yes.
24 Q   -- or what made you feel comfortable?
25 A   Yes.

---

Page 15

1  Q   All right.  And it looks like, alternatively,
2      through your career, at least in the, the latter
3      years, your job was either labeled as secretary
4      in certain parts of the District, or office
5      manager.  Am I right about that?
6  A   Yes.
7  Q   Was there any practical difference in what you
8      were doing in those two jobs?
9  A   Not really.
10 Q   I didn't get that sense.
11 A   I mean, it -- I mean, no, not really.
12 Q   Okay.
13 A   Some, some people have got a little more pay for
14     it, but...
15 Q   Pay for the office manager versus the secretary
16     job?
17 A   Uh-huh.
18 Q   But you did not?
19 A   No, I did not.
20 Q   All right.  Well, it's a good place to start in
21     terms of documents.
22         I'll hand you, through the course of the
23     deposition, documents that I have and ask you
24     about those, give you the opportunity to look at
25     them.

---

Page 16

1  A   Sure.
2  Q   I don't think many of them are complicated,
3      other than if you -- they have a big handbook,
4      as you're probably aware.  I'm going to hand you
5      now what will be marked as Defendant's
6      Deposition Exhibit 1.
7          (WHEREUPON, Exhibit Number 1, Position
8      Description - Secretary, was marked for
9      identification.)
10         MR. SWIDER:  I'll give you one.  I'll give
11     you one, Aaron.
12         MR. WILLIAMSON:  Thank you.
13 Q   And then I will -- I'm going to give yours to
14     the court reporter and she'll put a stamp on it.
15         So what I've handed you goes back to 2010,
16     and it looks like it is a job description for
17     secretary, which doesn't have your signature on
18     it, so I don't even -- I won't even ask you,
19     especially going back that far -- who made the,
20     the change here between sanitation and BWQ.  I'm
21     not sure it's relevant, but maybe it is.  BWQ
22     is --
23 A   Bureau of Water Quality.
24 Q   Bureau of Water Quality.  That's what -- Bureau
25     of Water Quality, which was a position in the

1   District.  Was it -- is sanitation just the same
2   thing as Bureau of Water Quality?  Or is that a
3   broader term?  Do you see how sanitation has
4   been marked out there and BWQ has been added?
5 A  Yes.  I see that.
6 Q  Is there -- in your mind, was there any
7   difference between Bureau of Water Quality and
8   just the sanitation department?  Is that a
9   separate division?
10 A  Yeah.  They're two different departments.
11 Q  Okay.  Okay.  So there is a sanitation
12   department?
13 A  Yes.
14 Q  Separate from the BWQ department?
15 A  Yes.
16 Q  Okay.
17 A  And if --
18 Q  Go ahead.  What is it?  Because it will help me
19   understand the difference.  So the, the
20   sanitation department, what did they do that was
21   different from the, from the water quality?
22 A  Well, the, the secretary's position, probably
23   not a lot.
24 Q  Okay.
25 A  But departments are different.

1 Q  Okay.  And what do they do that's different?
2 A  Sanitation?
3 Q  Uh-huh.
4 A  They pick up trash.
5 Q  Uh-huh.
6 A  Water quality is responsible for keeping track
7   of pollutants in the river, trying to keep the
8   river clean.
9 Q  What river is that?
10 A  White River.
11 Q  Were there more employees working for the
12   sanitation department, generally, than there
13   would be for the BWQ department?
14 A  Yes.
15 Q  And what would you say that ratio would be or --
16   approximate numbers?  I'm not holding you to it.
17   I'm just trying to get a sense.
18 A  Oh, my goodness.  We had probably less than 20.
19 Q  In BWQ?
20 A  Uh-huh.
21 Q  And sanitation would be a lot, I would assume?
22 A  It would probably be 100 or more, maybe.
23 Q  Because you have all the people picking up the
24   garbage, or the trash?
25 A  Right.

1 Q  Okay.
2 A  I mean, that's just a guess.  I mean, I'm not --
3   you know.
4 Q  It makes sense that that department would be
5   considerably smaller than the sanitation
6   department, because I wasn't even aware that
7   there was this separate department.
8      And just to outline a little bit, if you
9   can help me, in Muncie Sanitary District, those
10   are two departments.  I assume there's
11   administration?
12 A  Muncie Sanitary District has an administration
13   office.
14 Q  And then are there other, a lot of other
15   departments or just a few?
16 A  They have an engineering department.  They have
17   a sewer maintenance department.
18 Q  Okay.
19 A  They have a water pollution control.
20 Q  Water pollution...
21 A  Control.
22 Q  Control.
23 A  They have a storm water, which falls kind of
24   under the Bureau.
25 Q  Of Water Quality?

1 A  Quality.
2 Q  Okay.
3 A  And then they have sanitation and water quality,
4   water quality.  And I may -- I don't think I've
5   left anything out but...
6 Q  Did you say sanitation and water quality,
7   separate from what we've talked about already?
8      In other words, we've got the Bureau of
9   Water Quality?
10 A  Okay.
11 Q  And then you've got storm water under that.  And
12   then it sounded like your last department also
13   dealt with water.  I thought you said sanitation
14   and water?
15 A  No.  Just sanitation, water pollution control,
16   or wastewater treatment, because they changed
17   their name.  When I went to work for them, it
18   was wastewater treatment.
19 Q  All right.
20 A  And then they changed it to water pollution
21   control.
22 Q  Okay.
23 A  So they have water pollution control.
24 Q  Sewer maintenance?
25 A  Sewer maintenance, sanitation, BWQ --

Page 21

1 Q  Yep.
2 A  -- and then the storm water.
3 Q  Okay.  Storm water is another one.  Now, do --
4    as you look at the size of these departments,
5    and I'm putting this --
6 A  They also have a billing office.  Sorry.
7 Q  Which would be part of administration or not?
8 A  No.  It's a separate office.
9 Q  Okay.
10 A  It's financial.  I'm not sure what they call it
11    now.  It used to be the billing office.  I don't
12    know if it's still called billing office or not.
13 Q  And all of these are Muncie Sanitary District
14    departments, separate from the City of Muncie
15    and all its departments; correct?
16 A  Yes.
17 Q  And so from your standpoint, as you recall, was
18    the sewer maintenance department about the same
19    size as BWQ, or was that smaller?
20 A  No.  They have more employees.
21 Q  More employees.  And do they have their own
22    secretaries?  I assume they do as well?
23 A  At the time, there was two employees.
24 Q  Two secretaries or two --
25 A  I don't know what their titles were for sure.

Page 22

1 Q  Okay.  Okay.  When you say "two employees" --
2 A  Uh-huh.
3 Q  -- you mean not overall, you mean...
4 A  Well, they had two office people.
5 Q  Oh, office people, okay.  That's what you meant.
6    Got it.
7       How many office people, as you described
8    them, would BWQ have at any given time?  Would
9    it just be the one?
10 A  Just the one.
11 Q  Okay.  And then sanitation department probably
12    has several?
13 A  As far as I know, they had three or four.
14 Q  Okay.  And then administration, I guess they --
15    do they have -- they would have receptionists,
16    secretaries or...
17 A  They would have a receptionist on and off, but
18    they had one office manager.
19 Q  Okay.  And the size of that department, I'm just
20    comparing with BWQ, same?  Larger?  Smaller?
21 A  What --
22 Q  Total number of employees' in administration?
23 A  -- the admin?
24 Q  Yeah.
25 A  It's smaller.

Page 23

1 Q  Uh-huh.  And then water pollution control?
2 A  Had one secretary.
3 Q  One secretary.  And was it generally --
4    department bigger or smaller than BWQ?
5 A  It was larger.
6 Q  Larger.  Substantially larger or just --
7 A  No, because they have three shifts.
8 Q  Oh, okay.  So it is larger?
9 A  Yeah.  I mean -- and I don't know want to say
10    that -- the shifts aren't that large.
11 Q  Okay.
12 A  They -- you got to remember, I've not been there
13    for a while --
14 Q  I understand.  I understand.
15 A  -- but I used to be -- I used to work in that
16    department.
17 Q  Ah.
18 A  And when I worked in that department, there were
19    at least three operators a shift, and then --
20 Q  Okay.
21 A  -- they also had a maintenance department that
22    had at least probably 10 or 15 people.  And they
23    had a belt press crew, but it was all under one
24    department.
25 Q  Okay.  And then finally, storm water?

Page 24

1 A  That was one person.
2 Q  Okay.
3 A  Well, two.
4 Q  And they had a billing office?
5 A  And then in the billing office, I'm not -- I
6    don't recall exactly how many employees they
7    had --
8 Q  Uh-huh.
9 A  -- but they had at least five.
10 Q  Okay.  Back to Exhibit 1 -- thank you.  That is
11    very helpful.
12       Exhibit 1, now I understand there's a
13    difference, obviously, between the sanitation
14    department and BWQ.
15       Going back, let's say -- this is 2010 --
16    would you have been working for BWQ in 2010?  Or
17    had you gone back and forth?  Do you recall?
18 A  I don't, I don't remember when I went to BWQ.
19 Q  Okay.  And I have a couple documents --
20 A  I really don't.
21 Q  -- that might help us.
22 A  That's fine.
23 Q  Let's take a look --
24 A  Right off the top of my head, I don't remember
25    exactly.  I do know that -- I do know the job

Page 25

1    that I signed up for, it was for an office
2    manager's position.
3  Q   In BWQ?
4  A   Yes.
5  Q   And you had applied for a lateral transfer and
6    didn't get it one time?
7  A   Yes.
8  Q   And I've got, I've got a document on that, I'll
9    bring out in a minute.
10 A   Yes.
11 Q   Okay.  But just running from -- and, and I'm
12   looking -- if we're looking at 2010, that's ten
13   years before you left, were you --
14 A   I didn't work --
15 Q   -- still going back and forth or were you at
16   BWQ?
17 A   -- I didn't work -- I don't -- I don't remember.
18   But --
19 A   I don't think I worked at water quality ten
20   years.  I might have, but I don't think I did.
21 Q   So you were with sanitation department before
22   you went to BWQ?
23 A   I worked at sewer maintenance prior to --
24 Q   And how long --
25 A   -- water quality.

Page 26

1  Q   -- how long were you sewer maintenance?  Was
2    that the majority of your career?
3  A   No.
4  Q   Okay.
5  A   Engineering was the majority of my career, but
6    at one point, engineering and sewer maintenance
7    were in the same department.  And I worked sewer
8    maintenance and as a -- I cleaned sewers.
9  Q   Physically?
10 A   Yes.
11 Q   There's no shame --
12 A   There's no --
13 Q   -- in that.
14 A   -- I mean, there's no other way of putting it.
15   Yes, I did clean sewers.
16 Q   But that would go back quite a ways?
17 A   Yes.
18 Q   Because I don't see anything in this job
19   description --
20 A   No.  There's nothing in that that -- in this job
21   position that would say that I would have to do
22   that, no.
23 Q   Okay.
24 A   Other than maybe the lesson that says you do
25   what you're told.

Page 27

1  Q   Right.  All right.  So these changes, from the
2    engineering department and then the sewer
3    maintenance to sanitation and BWQ, this happens
4    as part of your career?
5  A   Most of the moves that I made were for a higher
6    rate of pay.
7  Q   That makes sense.
8  A   It was to help myself and my kids.  Simple as
9    that.
10 Q   Yep.
11 A   I mean, I don't know how else to put it.
12 Q   I think we all understand that.
13       And so again, was there a point near the
14   end of your work for the District where you were
15   just in BWQ?
16 A   Yeah.
17 Q   And would that be, could that be as many as five
18   years?
19 A   About, I'd say.
20 Q   Last five years?
21 A   Yeah, about that.
22 Q   Let's look at that for a guidepost and then
23   these documents may help us out, because this --
24   the reason why I focused on 2010, because this
25   document was in your personnel file, but it may

Page 28

1    have nothing to do with you, because if -- and
2    the date maybe doesn't indicate anything
3    because, even though this job description was
4    written in April of 2010, you might have gotten
5    the job in April of 2015, with the same job
6    description.
7        Were you working days?  This has 7 a.m. to
8    3 p.m.
9  A   Yes.
10 Q   And for the last five years?
11 A   (Nods.)
12 Q   We'll use that as a benchmark.  And so at the
13   time that you left, would this have been an
14   accurate job description?  And I'm looking at,
15   you know, "Answers telephones, greets office
16   visitors, determines nature of call, responds to
17   inquiries" --
18 A   Yes.
19 Q   And I think, generally, in the complaint itself
20   that was filed in this case, you also have at
21   least a summary of duties, and -- let's see what
22   this says.  So in Paragraph 17 of the complaint,
23   and I'll bring this exhibit out later, but take
24   a look at 17.  Would you read that for the court
25   reporter?

1  A  It says, "During her tenure as secretary,
2     Colsten's duties included answering telephones,
3     greeting and assisting visitors, various
4     clerical duties, and assisting with payroll."
5  Q  Is that an accurate description of what you were
6     doing at the time of your separation?
7  A  Well, I also took care, made sure that our
8     budgets were straight and --
9  Q  Okay.
10 A  -- paid the claims that were -- or invoices that
11    were submitted.
12 Q  Let me give you -- we'll just go ahead and put
13    it in the record now, the Complaint, and we'll
14    mark that as Exhibit 2, so we all are on the
15    same page here.
16       (WHEREUPON, Exhibit Number 2, Complaint for
17    Damages, was marked for identification.)
18    MR. WILLIAMSON:  Thank you.
19    MR. SWIDER:  Sure.
20 Q  So what I just went through with you was a
21    discussion of Exhibit 2, and I believe this is
22    the Complaint that was filed on your behalf to
23    initiate the lawsuit in this case.
24       Take a look at it and let me know if you
25    agree with that.

1  A  I was advised to file the Complaint with the
2     EEOC.
3  Q  I'll have that, too, and I see the confusion,
4     perhaps.  In order to file the lawsuit, at least
5     on a couple of your claims, the age claim and
6     the disability claim, you would first have to
7     file a charge with the Equal Employment
8     Opportunity Commission and/or Indiana Civil
9     Rights Commission.  And you did file a charge
10    with the Equal Employment Opportunity
11    Commission, which I will bring out as well.
12 A  Yes.
13 Q  But then, after those were dealt with, then this
14    lawsuit was brought.  And, and that's when the
15    FMLA claim was added, because there was no
16    agency requirement for that.
17       So this would be the lawsuit or the
18    Complaint that underlies the lawsuit in this
19    situation.  Does this look familiar to you on
20    that front?
21 A  Uh-huh.
22 Q  Did you, did you get to look at this before it
23    was filed?
24 A  Uh-huh.
25 Q  Okay.  So in the context of the job description,

1     I note there are several things on Exhibit 1,
2     and I'm trying to cover with you what, you know,
3     the major part of your job was.  And consistent
4     with the job description, particularly the first
5     paragraph, is Paragraph 17 of the Complaint
6     where we've outlined some duties:  Answering
7     telephone, greeting and assisting visitors,
8     various clerical duties, assisting with payroll,
9     and then you just mentioned keeping budgets
10    straight.  What does that entail?
11 A  To make sure that we didn't run out of money.
12 Q  Okay.  You don't want to run out of money.
13       How, how would you administer that?  In
14    other words, would you, then, see the budget
15    which would be what you expect to happen during
16    the year, and compare that with what was
17    actually happening during the year on a regular
18    basis to see that those two weren't too far out
19    of line?  Is that a fair statement?
20 A  Yes.
21 Q  And would you do that monthly?  Weekly?
22    Semi-yearly?  Do you remember?
23 A  Biweekly.
24 Q  Okay.  And if you saw problems arising, who
25    would you raise those with?

1  A  Rick.
2  Q  Okay.  And by "Rick," you mean Rick Conrad?
3  A  Yes.
4  Q  Sitting with us today.
5       Pulling invoices, what does that entail?
6  A  You mean paying invoices?
7  Q  Probably, because I can't read my own writing.
8     All right.  So paying invoices?
9  A  Well, when our department would purchase an item
10    from, say, Menards --
11 Q  Yes.
12 A  -- they would send an invoice to our department,
13    and I would get on the system that we used, and
14    make sure that that bill or invoice got paid
15    from our budget, not --
16 Q  Okay.
17 A  -- not sewer maintenance or water quality or
18    any --
19 Q  Some other department?
20 A  Some other department.
21 Q  Anything that you would include, you know, as a
22    general part of your job description and duties
23    as a secretary at BWQ?  And take a look at
24    Exhibit 1, if that's helpful in terms of
25    triggering other things that you might have been

Page 33

```
 1    doing.
 2  A  Huh-uh.  Will you say that again?
 3  Q  Of course.
 4       I'm looking at what your job
 5    responsibilities and duties were at the time of
 6    your termination --
 7  A  Okay.
 8  Q  -- essentially.
 9  A  And that's -- okay.
10  Q  Is that generally -- we covered those?
11  A  Yes.  And that's --
12  Q  Yes, consistent with Exhibit 1, it has a lot of
13    other things that aren't related to what we
14    discussed.
15  A  Yes.
16  Q  And many are.  But if you look at Paragraph 17
17    of the Complaint, and you add to it, you know,
18    making -- reconciling the budget, or keeping the
19    budget straight, and paying invoices, do we
20    pretty much have what you did?
21  A  Yes.
22  Q  Very good.
23       Now, when you were with the District, I
24    assume you had various versions of a handbook?
25  A  Yeah.  You could say that.
```

Page 34

```
 1  Q  And it was a big handbook.  Is that a fair
 2    description of the handbook?  It had a lot in
 3    it.  I'm going to hand you it now and --
 4  A  It was when I started, and then it was whittled
 5    down to --
 6  Q  So it was bigger when you started than --
 7  A  Yeah.
 8  Q  This is a 2019 version.  So let's, let's take a
 9    look at this for a minute.  I'm going to hand
10    you what will be marked as Exhibit 3.
11       (WHEREUPON, Exhibit Number 3, Personnel
12    Policies Handbook - Muncie Sanitary District,
13    was marked for identification.)
14  Q  And I'll hand you, with it, what will be marked
15    as Exhibit 4.
16       (WHEREUPON, Exhibit Number 4, Employee
17    Acknowledgement Form, was marked for
18    identification.)
19  A  Thank you.
20  Q  And you can see that Exhibit 3 and Exhibit 4
21    relate to the 2019 Muncie Sanitary District
22    Handbook --
23  A  Yep.
24  Q  -- right?  Did you ever see the City of Muncie
25    Handbook?
```

Page 35

```
 1  A  City of Muncie's handbook?
 2  Q  Yes.
 3  A  No.
 4  Q  In terms of this handbook, which covers the
 5    District, you mentioned just a few minutes ago
 6    that this handbook had changed in scope and
 7    maybe size over the years, and it got smaller
 8    rather than bigger.
 9       So were there -- do you recall how, how
10    that came about?  Because I know, at one point,
11    I think during your EEOC charge with the, the
12    agency, you responded to a position statement
13    that we submitted.  And one of the things I
14    think you said was that the handbook became less
15    employee friendly.  Is that an accurate --
16  A  Yeah.  That's accurate.  Accurate.  I'm sorry.
17  Q  And what happened over the course of the years
18    to, in your -- as you recall, to make that
19    happen?
20  A  Well, at one point, there was a procedure that
21    employees could take, where if they were --
22    excuse me.
23  Q  Can I get you anything?  Water?
24  A  No.  I'm fine.
25  Q  Okay.
```

Page 36

```
 1  A  They could -- if, if they had a complaint, they
 2    could file a complaint with the department head.
 3    And it would go to a, a committee that was,
 4    like, the -- I think it was the board president
 5    and a department person.  I'm not sure.
 6  Q  Sure.  I understand.  It was a process for
 7    complaints?
 8  A  There was a process that they went through.  And
 9    then there would be a ruling, and if I -- you'd
10    have to look in this, because I don't --
11  Q  Let me take you there.
12  A  I don't think it's in there now.
13  Q  Let me take that, because I'll show you what I
14    think is in there now on that front, but let me
15    first go back and ask you whether Exhibit 4 is
16    your acknowledgment of receipt of Exhibit 3?
17  A  Yes.
18  Q  And that's your signature --
19  A  Yes.
20  Q  -- correct, on Exhibit 4?
21  A  Yes.
22  Q  Okay.  If you look at the very end of Exhibit 3,
23    and that would be Page Number 88, that outlines
24    what's called "Problem Resolution."
25       And take a look at that and see if that's
```

Page 37

1    different from what you just described, if you,
2    if you recall?
3  A   It's similar, yes.  Yeah, it's kind of the same
4    but...
5  Q   Let's take a look at Step 3, "In other words, if
6    the complaint cannot be solved satisfactorily,
7    it may be reviewed by the Board of Sanitary
8    Commissioners, president, upon request by the
9    District administrator or employee."
10  A   Uh-huh.
11  Q   "The President's findings and recommendations
12    are binding on the District and the employee."
13  A   Uh-huh.
14  Q   "In the event that the employer requests a
15    review, he shall first notify the District" --
16    "He/she shall first notify the District
17    administrator."
18        So it looks like the board president makes
19    a final decision, but then a review of that can
20    be obtained by going through the District
21    administrator, which at the time you left, was
22    Nikki Grigsby.  And she was on leave, obviously,
23    so Bill Smith, as the president of the, of the
24    board, was handling that function.
25        But all of this really goes to the question

Page 38

1    how this handbook got changed and what you meant
2    at the EEOC and from your -- as you're looking
3    at this, the complaint procedure may have been
4    different?
5  A   Not at that time -- I mean, I didn't file a
6    complaint --
7  Q   No, I know.
8  A   -- towards the District --
9  Q   Right.
10  A   -- because I --
11  Q   You mean over your termination?
12  A   Yes.
13  Q   Okay.
14  A   What was the point?
15  Q   I understand, and, and -- because you had
16    already been terminated, and you were terminated
17    by the very person who would -- you'd file your
18    complaint with?
19  A   Exactly.
20  Q   Okay.  So I have -- I understand that.  But I
21    was just looking at the general proposition that
22    the handbook, over the years, had become less
23    employee friendly?
24  A   Yeah.  And it --
25  Q   Do you have other examples of that?  Or is it...

Page 39

1  A   It was -- I don't know.  Well, at one point, the
2    District was unionized.
3  Q   I didn't know that.
4  A   Uh-huh.
5  Q   I did not know that.
6  A   Yeah.
7  Q   And so --
8  A   They were union.  They were -- they had the
9    Teamsters back in the day.
10  Q   And were you part of the bargaining unit?
11  A   I was not.
12  Q   Okay.
13  A   I was, however, a part of the bargaining unit
14    after the Teamsters was dismissed by one of the
15    mayors that came in, one of the newer mayors
16    that came in.  And the District employees
17    decided they wanted another union, and they
18    voted to have a union, and the District sat down
19    with employees and financial manager and I don't
20    recall who else was --
21  Q   Uh-huh.
22  A   -- there from the --
23  Q   Uh-huh.
24  A   -- but I was on that committee, yes.
25  Q   I'm not going to hold you to this, but are you

Page 41

1    the union, then the union was disbanded by the
2    mayor at that time.  I mean, that's part of the,
3    part of the crazy environment you were in;
4    right?  I mean, the mayor and the political
5    party changes and all the rules can change.
6  A   Uh-huh.
7  Q   And so in that '80s period, you became a little
8    bit more involved on the representing employees'
9    side, and that might have, that might have
10    changed the handbook or, or -- because you have
11    an opportunity, as the representative, and the
12    union had an opportunity to negotiate whether
13    handbook changes would happen or not and the
14    employee could say no or yes, but you could have
15    an impact?
16  A   At that point, yeah, but it fell through.
17  Q   Okay.
18  A   They didn't go -- they didn't follow through.
19    They didn't go through with the union because --
20    well, it just didn't go through.
21  Q   Right.
22  A   And employees wanted to close shop and it wasn't
23    going to happen, so from there on out, it was
24    whatever the District wanted to put in a
25    handbook, and that's the way you went, whether

Page 42

```
1    you liked it or whether you didn't.
2  Q  And there were things about that you didn't
3    like, I assume?
4  A  Well, there's things that every employee is not
5    going to like --
6  Q  Right.  Right.
7  A  -- I mean, you know...
8  Q  Did you -- I had a sense from talking with Rick,
9    that there were -- that you felt -- I don't want
10   to mischaracterize this, but did you -- were you
11   at odds at times with management over how
12   employees were treated?
13 A  Yes.  Sometimes.
14 Q  And would you make that known, from time to
15   time?
16 A  I'm not going to lie to you, yes.
17 Q  All right.  And did you, did you enjoy that a
18   little bit or -- again, I'm looking at
19   conversations you had with Rick in terms of your
20   being involved in change --
21 A  No.  I didn't enjoy it.
22 Q  Okay.  What was your general position?
23 A  It just -- I believe in people being treated
24   fairly.  And when you've got two employees and
25   you've got one being treated one way and one
```

Page 43

```
1    being treated another way, that's not fairly.
2  Q  Okay.
3  A  And yes, that's when I get a little irritated
4    and that's usually when I speak up.
5  Q  Okay.
6  A  And I never blindsided Rick.
7  Q  And, and I'm not -- and I have heard nothing to
8    the contrary, please.
9      I, I just in, in brief conversation with
10   Rick, talking about the employment situation, it
11   sounded like there were things you were unhappy
12   with?
13 A  Oh, yeah.
14 Q  But you were upfront about it.  You were upfront
15   about it?
16 A  You betcha.
17 Q  Absolutely.
18 A  And not only with Rick.
19 Q  Right.  And --
20 A  But that doesn't have anything to do with -- as
21   far as I know.
22 Q  With what?
23 A  With why I was let go.
24 Q  Okay.  So there were never points at which you
25   expressed that you were let go because of those
```

Page 44

```
1    disagreements?
2  A  No.
3  Q  Did you express that to anybody?
4  A  No.  Not to my knowledge, no.
5  Q  Okay.  And how did you -- what was your
6    relationship with Bill Smith on that front?
7  A  Wasn't a very good one.
8  Q  Okay.  And why?
9  A  Because when he came out to talk to me, he
10   actually gave me a choice.
11 Q  Okay.  And that relates to the termination?
12 A  Yes.
13 Q  And I'm going to get to that.  I just want to
14   have some background before that.
15     Were there other issues that you and Bill
16   had discussed where you had disagreement prior
17   to your termination?
18 A  Such as?
19 Q  That's my question to you.
20 A  Well --
21 Q  Maybe there isn't any.
22 A  I'm just asking because I'm sure that he and I
23   had disagreements on a lot of things --
24 Q  Okay.
25 A  -- so I mean, unless you're -- you know...
```

Page 45

```
1  Q  Well, no.  I'm asking you the questions because
2    I need to understand it from your standpoint.
3  A  Okay.
4  Q  My standpoint isn't going to be anything close
5    to yours.
6      When you say you had disagreements, do you
7    remember --
8  A  Well, yes, we had a lot of disagreements on
9    things about the District that should and should
10   not have happened that --
11 Q  Okay.  Such as, if you remember?
12 A  One was the canal.
13 Q  Okay.  What was that?  What happened there?
14 A  They built a canal.  It was a block long.  It
15   cost a lot of money.  It cost the rate payers a
16   lot of money.  It cost citizens.  And it
17   shouldn't have cost anybody that kind of money
18   to get rid of storm water.
19 Q  When was --
20 A  I mean, there was just things like that.
21 Q  Lots of those things?
22 A  I mean, it wasn't just employees.  It wasn't
23   always a difference of how they treated
24   employees.  It was a difference -- you know, I'm
25   a homeowner.
```

Page 46

1  Q   Yes.
2  A   I pay taxes.
3  Q   Yes.
4  A   I pay my sewage bill.
5  Q   Yes.
6  A   And when they do that and it costs me money to
7      pay my sewage bill, and it costs me more money,
8      then yes, it ticks me off.
9  Q   And you would raise that with Bill?  You felt
10     comfortable enough to do that?
11 A   I would feel comfortable if it was Biden sitting
12     there.  I don't care who it is.
13 Q   Good.  All right.
14         And other issues, do you remember issues
15     like that?  Because those, those are -- that
16     certainly makes sense.  And that was a -- there
17     wasn't anything you could do about it, other
18     than complain about it?
19 A   That's exactly right.  And I have that right.
20 Q   Absolutely.
21 A   I have a right for free speech.
22 Q   Absolutely.
23 A   That's all there is to that.
24 Q   Any other --
25         MR. SWIDER:  Yes?

Page 47

1          MR. WILLIAMSON:  Whenever you're ready, if
2      we could take a break.  Five or ten minutes.
3          MR. SWIDER:  Oh, okay.  Okay.  Sure.  I
4      want to hit this strand, if we can.
5  Q   Any other issues that you recall, like the
6      canal?  I mean, that was, that was obviously a
7      big issue.  How long ago was that canal
8      situation?
9  A   Couple, three years ago.
10 Q   Okay.  Any other issues like that that jump out
11     at you?
12 A   Yeah.
13 Q   What else?
14 A   I might as well just get it out there.
15 Q   Please.
16 A   There's a project that they did on -- I think it
17     was on Ribble, and it looked really nice.  The
18     sidewalks looked really nice, except they put
19     phone poles or utility poles in sidewalks and
20     people in wheelchairs have to maneuver around
21     them.  Now, you tell me that makes sense.
22     Sorry.
23 Q   No.  No.  I mean, that makes sense.  I mean --
24 A   So yes.
25 Q   And you live in that community?

Page 48

1  A   There were a lot of things that happened like
2      that that upset me.
3  Q   Okay.  Okay.  And that's --
4  A   And we were made to go to their ribbon cuttings
5      and look happy and -- so that they could have a
6      lot of people in their pictures for the
7      newspaper.
8  Q   All right.  And so as you described, there were
9      several of these types of agreements --
10 A   Yes.
11 Q   -- or disagreements that you had with Bill?
12 A   Yes.
13 Q   Did you have those with any other board
14     representatives?
15 A   No.
16 Q   Okay.  Okay.
17 A   He was the president.
18 Q   True.  Were you able -- I assume not, but were
19     you able to effect any change?  Or at least, did
20     he understand what you were saying?
21 A   Well, he understood, but no.
22 Q   Didn't make a difference?
23 A   No.
24 Q   All right.  There was a point at which you were
25     disciplined for political -- was it political

Page 49

1      work on company time?  Do you remember that
2      situation?
3  A   I remember being disciplined by Tracy Barton --
4  Q   Okay.
5  A   -- who is now under investigation by the FBI.
6      Well, he's under an indictment.  I don't know
7      when their hearing is going to be, but anyway...
8  Q   That would be the same with Nikki Grigsby?
9  A   Yes.
10 Q   Okay.
11 A   I was written up for the same thing on the same
12     day, written two different ways.  One, and then
13     the second one was so that he could give me time
14     off with no pay.
15 Q   You got suspended for a week?
16 A   Yes.
17 Q   Okay.
18 A   Five days.
19 Q   Right.  All right.  I'll give you that
20     suspension, if you want to take a break now,
21     we'll --
22 A   Yeah.  I need some water.
23 Q   Absolutely.
24         MR. SWIDER:  Let's get you water and a
25     bathroom break.

1      (A short recess was had.)
2  BY MR. SWIDER:
3  Q   All right.  We're back on the record --
4  A   Okay.
5  Q   -- and let me give you now what we've marked as
6      Exhibit 5, I think.
7      (WHEREUPON, Exhibit Number 5, June 4, 2012
8      Memorandum, was marked for identification.)
9      MR. WILLIAMSON:  Thank you.
10 Q   I've just handed you what has been marked as
11     Exhibit 5 --
12 A   Uh-huh.
13 Q   -- and realized that I hadn't really finished
14     talking to you about Exhibit 3.
15 A   Oh.
16 Q   So let's go back to that for a minute and just a
17     few provisions of the handbook I wanted to go
18     over with you.  And this is going to be based on
19     your recollection again, because this handbook,
20     as you know, went into effect in 2019.  So there
21     might have been other versions, but to the
22     extent that you remember that that's a change,
23     as I go through a few policies, let me know.
24     I'm not -- if you don't say it's a change,
25     that doesn't mean that it isn't.  It's just your

1      own recollection, because these are policies,
2      that generally, that you would see in any
3      handbook --
4  A   Okay.
5  Q   -- but I just want to be sure that -- so look,
6      first, at Page 1, and you'll see, in Section
7      1.1, that second paragraph talks about you, you
8      and all the other employees in the District as
9      being at-will employees.
10     Do you know what that means?
11 A   Uh-huh.
12 Q   What does that mean to you?
13 A   They don't -- as far as -- they don't -- they
14     can come in and say, "We don't need you and
15     you're gone."
16 Q   Right.  They can fire you for any reason at any
17     time for no reason, good, bad, or no reason at
18     all --
19 A   Right.
20 Q   -- or you can quit at any time?
21 A   Right.
22 Q   All right.  And then Page 2, you see there's an
23     Equal Employment Opportunity clause?
24 A   Uh-huh.
25 Q   And that, too, would probably be pretty standard

1      and not a change, unless you remember any change
2      which says, "No employee or applicant for
3      employment will be discriminated against because
4      of race, color, creed, religion, age, national
5      origin, sex, disability, genetic information, or
6      any other classification under local, state, or
7      federal law.  Equal Employment Opportunity
8      includes, but is not limited to hiring,
9      promotion, transfer, demotion, termination,
10     training."
11     So it's kind of a limit on the at-will
12     doctrine, so you can be fired at any time for
13     any reason, except based on your age, based on
14     your disability, and while not stated here,
15     based on FMLA filings.  So those would be
16     exceptions to, to the rule.
17     During the course of your employment prior
18     to your termination, did you ever make a
19     complaint based on this EEO policy?
20 A   No.
21 Q   Okay.  And if you look at Page 23, I'll ask you
22     once you get there.
23 A   Okay.
24     MR. SWIDER:  Off the record.
25     (A short recess was had.)

1      MR. SWIDER:  All right.  Back on.
2  BY MR. SWIDER:
3  Q   So that looks to be the District's Family and
4      Medical Leave Act policy, and you can see it
5      stretches for several pages.
6  A   Right.
7  Q   You did take FMLA while you were working for the
8      District; did you not?
9  A   Yes.
10 Q   Did you ever feel that you were treated unfairly
11     prior to the termination, based on your FMLA
12     time that you took off or requested?  Was there
13     anything that suggested to you that they weren't
14     following this policy?
15     And you can take a look at the policy if
16     you want.  You can see on 24, you're entitled to
17     12 weeks of paid or unpaid FMLA leave for
18     situations like yours, your own serious health
19     condition.
20 A   Right.
21 Q   This was a right that law recognizes and that
22     this handbook appears to recognize for several
23     pages.  So let me back up.
24     You did take FMLA intermittent leave?
25 A   Yes.

Page 54

1  Q   Did you take any leave on a full-time basis?  In
2       other words, for a period of time like a week or
3       two weeks or three weeks?  I think you might
4       have taken that --
5  A   I did --
6  Q   -- kind of leave as well?
7  A   -- in -- yes, because I did fall and I had a
8       broken femur and a cracked pelvic bone, and I
9       was in a nursing home --
10 Q   Hmm.
11 A   -- in September of 2019.
12 Q   And I've got documentation of that, so we'll
13      look at that, because there are other FMLA
14      leaves you took on an intermittent basis, but
15      that one I'm familiar with because --
16 A   That was the only one that I believe that I took
17      that was consecutive.
18 Q   Right.  Consecutive weeks.  But there was
19      another time when you were off for several
20      weeks.  And the reason I know that is because
21      the policy lets people give you sick time --
22 A   Yes.
23 Q   -- so that you don't have to dig into your
24      vacation.  And I think one of the people that
25      gave you 40 hours --

Page 55

1  A   Yes.
2  Q   -- was Rick Conrad?
3  A   Was Rick.
4  Q   What was that?
5  A   I believe that's when I had pneumonia.
6  Q   Okay.  But for now, the question is:  Did you
7       feel, at all, that you were not given your FMLA
8       rights while you worked for the District?
9  A   No.  Not -- I mean, not -- I mean, I've -- no.
10 Q   When you asked for it, you got it?
11 A   Yeah.  The personnel department gave it to me,
12      yes.
13 Q   All right.  And, and you may not be fully aware
14      of this, but when you say "the personnel
15      department," my understanding is -- tell me if
16      I'm right -- that while the District and the
17      City are independent bodies, there are certain
18      functions that they have a work-sharing
19      agreement over.  Are you familiar with that?
20 A   Yes.
21 Q   And that work-sharing agreement, as I understand
22      it, has the District providing benefits help,
23      Melanie Lanich, for instance, does the benefits
24      side for the City and for the District.  On the
25      other hand, personnel issues, the, the City

Page 56

1       helps the District.
2           And so when you would apply for FMLA leave,
3       you would go generally through Sarah Beach;
4       right?
5  A   Yes.
6  Q   And is she with the City or with the District?
7  A   She was actually called the City personnel.
8  Q   Right.  And that's what I'm saying.
9  A   Yes.
10 Q   Part of that work sharing would go to the
11      City --
12 A   Yes.
13 Q   -- and then Sarah Beach would approve, and I've
14      got documents where she approves your FMLA
15      leave?
16 A   Yes.
17 Q   Okay.  And to the extent she does that, do you
18      have any knowledge whether they tell someone
19      like Rick Conrad or Ron Barlow why you're taking
20      leave?  Or does -- do you know that?  You may
21      not know whether they even says anything other
22      than, "Linda is going to be on leave for three
23      weeks"?
24 A   That -- yeah, I don't know.
25 Q   You don't know that.  Okay.

Page 57

1           Then, if you look at Page 36, that is the
2       American with Disabilities Act policy, ADA
3       policy, and under that policy, if you look at
4       the top of Page 37, the, the first paragraph or
5       second paragraph, I guess both, "If a person is
6       not able to perform the essential functions of a
7       job, even with reasonable accommodation, then
8       the person is not qualified for the position.
9       The District will reasonably accommodate persons
10      with a disability.  Such reasonable
11      accommodation may include making facilities
12      readily accessible to individuals with a
13      disability, restructuring jobs, modifying work
14      schedules, modifying equipment or other similar
15      accommodations."
16          Did you ever make a complaint under this
17      ADA policy?
18 A   No.
19 Q   Did you ever ask for an accommodation?  Or were
20      you able to perform the job at all times,
21      notwithstanding any disabilities that you might
22      have had?
23 A   I was able to perform my job.  There were times
24      when I had to call in later than what we were
25      required and, therefore, the FMLA intermittent

Page 58

1  leave came in --
2  Q   Okay.
3  A   -- because there were times when I woke up and I
4      couldn't breathe and I would have to do a
5      breathing treatment before I could even go to
6      work.
7  Q   And you never -- at least I didn't see it in
8      your file, you never got disciplined for that?
9  A   No.
10 Q   And -- but it might have triggered FMLA
11     intermittent leave?
12 A   Yes.
13 Q   And you got that leave?
14 A   Yes.
15 Q   Okay.  Okay.  Any -- anything else in terms of
16     seeking -- it doesn't sound like you needed any
17     reasonable accommodation, other than what you
18     exercised under the FMLA for the COPD.  When,
19     when were you diagnosed with COPD?
20 A   Oh, my.  I don't recall.
21 Q   Okay.  Long time?
22 A   I mean, it was a long time.  It was, it was
23     before I even went to sewer maintenance.
24 Q   Okay.
25 A   And it just, it progressively got worse and then

Page 59

1  I decided to quit smoking and --
2  Q   That helped?
3  A   Yeah, that -- I mean, you know, the damage was
4      done, but yes, it did help.
5  Q   Right.
6  A   I mean --
7  Q   And so that would have been even before you went
8      to BWQ?
9  A   Uh-huh.  Yes.
10 Q   Okay.  And I noticed when we came into the
11     deposition today, you had oxygen with you?
12 A   Yes.
13 Q   Did you ever have that oxygen at work?
14 A   I don't believe I had it at the Bureau.
15 Q   Okay.
16 A   I did have it at sewer maintenance.  And it's
17     not oxygen.  It's --
18 Q   Okay.
19 A   -- it's a concentrator.
20 Q   Okay.
21 A   All it does is, I can plug it into a -- an
22     electrical outlet, it recirculates the air.
23 Q   Oh, okay.
24 A   So you don't have to have all the --
25 Q   The kind of --

Page 60

1  A   -- notices saying "Hazardous," you know, "Oxygen
2      in use."
3  Q   Right.  Right.
4  A   You know, it's not flammable.
5  Q   I gotcha.
6  A   Because I went -- I had to jump through hoops
7      when I worked in sewer maintenance because of
8      that, so I did have some issues, at that point,
9      with accommodations.
10 Q   Right.  And that would have been five to ten
11     years ago?
12 A   Yes.
13 Q   All right.  And we had talked a little bit about
14     your changing jobs --
15 A   Uh-huh.
16 Q   -- for a higher rate of pay?
17 A   Uh-huh.
18 Q   Were the times that you changed just because you
19     wanted new management or new supervising?  In
20     other words, where you had, "I'm tired of this
21     guy or this gal, I'm going to make a change"?
22 A   Yeah.
23 Q   Were there any of those types of changes?
24 A   There were sometimes that that happened, yeah,
25     but, like I said, when I signed up, the job

Page 61

1  position that was open at water quality was an
2  office manager's position, and I didn't know if
3  it was a dollar more or not, but, yeah.
4  Q   Okay.  All right.  And, and I think I've already
5      asked you this, but just let me confirm.  Page
6      37, the last paragraph, under the ADA policy, it
7      says, "Any individual who believes he or she has
8      received treatment inconsistent with the
9      policies set forth above, or any other
10     requirement of the American with Disabilities
11     Act," ADA, "can file a complaint within 90 days
12     of the date of the alleged discriminatory act or
13     practice with the District ADA coordinator,"
14     that is the district administrator.
15     Other -- we talked about once you were
16     discharged, this process didn't make much sense
17     to you, but you didn't utilize the process or
18     need to utilize the process prior to the
19     termination; did you?
20 A   No.
21 Q   Okay.  Then I'm looking at Page 85.  I'll join
22     you there, and, and I don't think, I don't think
23     you were ever really written up.  I didn't see
24     anything in the file that -- unless we go back a
25     long time.

Page 62

1    Other than what we'll look at on that
2  political front that we talked about, were you
3  ever written up for any of these offenses on
4  Pages 84 or 85?
5    And I'm not trying to set you up.  I don't
6  have any write-ups.  I'm just asking you whether
7  there might have been something I'm not aware
8  of?
9  A   Not that I'm aware of.
10  Q   I think the write-up on the political activity
11  at work included -- the only thing I could find
12  here is insubordination, is what was listed on
13  the write-up.  And that's -- you see that as the
14  30- -- Number 37 on Page 86.  That's the only
15  place I see "insubordination," and we'll talk
16  about that write-up.
17    But other than that, there's nothing else
18  that you recall being written up or disciplined
19  for; is there?
20  A   The only thing I can remember being written up
21  for was I cussed on the radio one time.  I said,
22  "Damn."
23  Q   How long ago was that?
24  A   When I was an inspector.
25  Q   All right.

Page 63

1  A   That was a long time ago, because I was an
2  inspector and it was like 100 in the shade and a
3  lady made a complaint and wouldn't answer her
4  door.  And when I got back out to my truck, I
5  said "Damn" on the radio and I got written up
6  for that.
7  Q   Well, I hope you've cleaned up your language
8  since then.
9  A   Yeah, it only got worse.
10  Q   Nothing else?  Nothing else?
11  A   But other than that, I'm sure I've -- you know,
12  over 40 years, I'm sure I got written up.
13  Q   I mean, I think I told --
14  A   Because if it comes to my mind, it's going to
15  come out my mouth.
16  Q   That makes sense.
17  A   Most of the time.
18  Q   That makes sense.
19  A   That's all I can say.
20  Q   I gotcha.  And, and when Aaron and I were doing
21  discovery, I think we said, "Hey, ten years is
22  plenty.  We don't need to go back beyond that,"
23  and that's even too long probably.  All right.
24    The only other thing we've already talked
25  about and that is the problem resolution

Page 76

1  work?
2  A   Yes.
3  Q   You weren't prohibited from doing that.  It was
4  just you couldn't do it on the clock?
5  A   Yes.  And I -- I'll shut up.
6  Q   Let me hand you your next evaluation.  If I've
7  got this in the right order, this will be
8  Exhibit 8.
9    (WHEREUPON, Exhibit Number 8, Performance
10  Appraisal - February 17, 2017, was marked for
11  identification.)
12  Q   Do you recognize this document?
13  A   Yes.
14  Q   And what is this?
15  A   It's another -- it's an evaluation from Rick
16  Conrad.
17  Q   So by then, you had moved to Bureau of Water
18  Quality?
19  A   Yes.
20  Q   And that was a move you wanted to make?
21  A   Yes.
22  Q   Did you make more money in that move?  Or is
23  this one of the moves that you just wanted to
24  get out from under --
25  A   No.  It wasn't any more money.

Page 77

1  Q   Okay.  So this would have been a culmination a
2  little bit of being out of Barton's department?
3  A   Yes.
4  Q   Okay.  And it looks like this is another good
5  review.  You got an 84.1, which isn't much
6  higher than the 83, the year before, but I
7  assume you got along better with Conrad?
8  A   Well, yes, and the fact that moving to the
9  Bureau of Water Quality, I wasn't as familiar
10  with that department and what it, what it did.
11  So I was just learning, so I didn't --
12  Q   Expect huge ratings?
13  A   Yes.
14  Q   Makes sense.
15  A   Yeah, because in sewer maintenance, I cleaned
16  sewers before Tracy was even working for the --
17  Q   Uh-huh.  Uh-huh.
18  A   -- I mean, before he even came to work for the
19  District, you know, so, yes.
20  Q   Let me, at a broader level, ask you this
21  question, because I think I know how you're
22  going to answer, but I want to understand, how
23  was your relationship with Rick Conrad when you
24  started?
25    And did that change at all while you worked

Page 78

```
1    under Rick, because you worked under Rick until
2    you left?
3  A  Well, as far as I know, we didn't have a bad
4    relationship.  And I always told him I would be
5    up front with him and I wouldn't blindside him
6    with anything because I'm notorious for stating
7    my opinion.  I mean, that's just who I am.
8  Q  Right.  Right.
9  A  And I always told my bosses that if I was going
10   to -- if I did something that I thought might
11   come back at them, then I would tell them.
12 Q  Right.
13 A  And that's what I did.
14 Q  Okay.  Yeah.  I have nothing that suggests to
15   the contrary --
16 A  So --
17 Q  -- that the two of you didn't get along well.
18 A  I mean, I -- you know.
19 Q  This review, you're six months into it, it looks
20   like, and you didn't disagree with the review;
21   correct?
22 A  No.
23 Q  All right.  And again, it's a good review.  In
24   other words, your overall rating is going to be
25   in the "very good" category, I think.  Right?
```

Page 79

```
1    Anything -- it looks like on the form itself,
2    anything between 80 and 89 is very good --
3  A  Yes.
4  Q  -- right?  And your overall rating was 84.1, so
5    that's comfortably in the very good range;
6    correct?
7  A  Right.
8  Q  Taking these in chronological order, at least
9    trying to so that we can keep our timeline
10   intact, and I'm going to hand you, now, one of
11   the first absences, FMLA-type situations that I
12   have and, and really, the only ones that I have.
13   Again, maybe because we're only going back ten
14   years or so, this will be marked as Exhibit 9.
15   I'm sorry.  That's going to be yours to mark.
16      (WHEREUPON, Exhibit Number 9, FMLA
17   Approval, was marked for identification.)
18 Q  Now, you may not have seen this document before.
19   Do you recall ever having seen it?
20 A  Pardon?
21 Q  You may not have seen this document.  I don't
22   see your signature on it.
23 A  No.  I don't -- I never saw this.
24 Q  Okay.  Let's look at the event that it purports
25   to relate to.  It looks like FMLA approval, if
```

Page 80

```
1    you look at the first page of Exhibit 9,
2    starting on 2/23/17.  So we're going back to
3    2017.  And it looks like you were approved for
4    intermittent FMLA, and the second page gives us
5    a sense of who Sarah Beach was.  Remember, we
6    talked about the personnel function being
7    handled by the City --
8  A  Yes.
9  Q  -- because you can see she's with the City;
10   correct?
11 A  Yes.  I'm sorry.
12 Q  And she's granting the FMLA.  We got -- I've got
13   nothing else.  I don't think the District has
14   anything else that I'm aware of on this, other
15   than the approval of the leave being
16   communicated to Rick Conrad.  What was this
17   leave for?  Do you remember?  It looks like some
18   kind of episodes.
19 A  The only -- it would have had to have been
20   pneumonia, because when I'm in and out of the
21   hospital --
22 Q  Yes.
23 A  -- with pneumonia, because of my COPD --
24 Q  Yep.
25 A  -- it, it
```

Page 81

```
1  Q  Knocks you out?
2  A  Yeah, it does.  That's the only thing I can
3    think of --
4  Q  Okay.
5  A  -- in February of 2017.
6  Q  All right.  All right.  So intermittent leave
7    would let you take off when you needed to or
8    when you said --
9  A  For my breathing treatment.
10 Q  -- or you know, come in later, because I need a
11   breathing treatment.  This could have been
12   consistent with that?
13 A  Yes.
14 Q  And you've already testified, there's nothing
15   about this you were upset about.  Everything was
16   handled properly as far as you're aware?
17 A  As far as I'm aware, yes.
18 Q  Would you have shared details -- from the
19   documentation, from my understanding, Rick
20   Conrad would not know what this was all about.
21   Did you share with him what this was all about
22   or do you even recall?
23 A  I don't recall.
24 Q  Okay.  Possible that you did?
25 A  It's possible, but I don't recall.
```

1 Q  Possible.  Okay.  Did he give you any trouble
2    over this leave?
3 A  Not that I recall.
4 Q  Okay.  All right.
5       And remember, that's February of 2017.
6    Now, I'm going to give you a document in April
7    of 2017 related maybe to the same thing, maybe
8    to something else.  And this will be marked as
9    Exhibit 10.
10      (WHEREUPON, Exhibit Number 10, April 3,
11   2017 email, was marked for identification.)
12 A  Thank you.
13 Q  Uh-huh.
14 A  It would have had to have been --
15 Q  So this is a few months later.  It looks like
16   you're, again, approved for FMLA leave.  It's
17   not much different from the approval you already
18   had on file.  Let's see.
19 A  Trying to remember if that's when I had surgery
20   and got pneumonia in both lungs.
21 Q  Well, I'll be able to help you out because there
22   was this point -- remember, I was telling you --
23   when people were giving you their sick leave.
24   Let's take a look at that.
25 A  That I...

1 Q  Maybe.
2 A  I know there for a while, I didn't know if I was
3    going to make it or not.
4 Q  Okay.  You know what?  I have this written out
5    here.
6       No.  What I get -- that happens in April
7    and May of 2019 --
8 A  Okay.
9 Q  -- and then --
10 A  That's when I had that.
11 Q  Okay.  Yeah.  It starts with March of 2018,
12   we'll look at that.  But then in April and May
13   of 2019, Rick, Chuck Jones and Barlow gave you
14   time, so that was, like, three weeks?
15 A  Yes.
16 Q  And then in October of 2019, I think you had two
17   more weeks.  So we'll look at that separately
18   when we get there.
19 A  Okay.
20 Q  Anything else that you recall about this?
21 A  No.
22 Q  Okay.
23 A  Had to do with pneumonia and COPD.
24 Q  Makes sense.
25 A  That's all I can say.

1 Q  And it is, in this one, for whatever reason,
2    Nikki is copied, and I don't see her copied in
3    Exhibit 9, but I don't know if that has any
4    significance.  Are you aware of any significance
5    there?
6 A  No.
7 Q  Okay.  But again, no problem as far as you
8    recall in connection with getting that leave and
9    taking that leave; correct?
10 A  (Shakes head.)
11 Q  All right.
12 A  No.
13 Q  All right.  Let me give you now what will be
14   marked as 11, Exhibit 11.  And this is your next
15   performance evaluation.
16      (WHEREUPON, Exhibit Number 11, Performance
17   Appraisal - May 26, 2017, was marked for
18   identification.)
19 Q  And I think you got the last one late.  That's
20   why they're both the same year.  I'm missing
21   one.  Okay.  Here it is.  Okay.
22      So the last evaluation I think we looked at
23   was in February of 2017.  This one is in May.  I
24   don't know why this was so close together, but
25   it looks like another good review.  This one is

1    from Rick, and this score is continuing to go
2    up, I think, a little bit.
3       Any issues with this review?  Any issues
4    with this review or...
5 A  Nope.  I didn't have any.
6 Q  Okay.  There is one note I want to just cover
7    with you, and that is on the second-to-the-last
8    page, Item 2, Rick says, "Reduce the amount of
9    criticism that is not constructive.  Handle it
10   discreetly," did you have any idea what that
11   related to?  Maybe just speaking your mind
12   again.  I don't know.
13 A  Apparently, I said or did something outside the
14   office that got -- I mean, people say things
15   about their bosses --
16 Q  Right.
17 A  -- to other people, and I apparently said
18   something and it got back to him and that was...
19 Q  But you don't recall specifically?
20 A  No, I don't remember.
21 Q  I mean, it could even be you're criticizing the
22   board or the board president?
23 A  It could have been.  I don't know.
24 Q  Okay.  Okay.  It wasn't a big deal to you at the
25   time?

Page 86

1  A  Didn't seem like it.
2  Q  And it doesn't look like it was a big deal to
3     him, because, again, your overall rating was
4     comfortably in the very good range; correct?
5  A  Yes.
6  Q  All right.  Going to hand you what will be
7     marked as Exhibit 12.
8        (WHEREUPON, Exhibit Number 12, Position
9     Description - Secretary, was marked for
10    identification.)
11 Q  And I think this is simply the job description
12    you had, now as the secretary of the Bureau of
13    Water Quality.  Again, I don't know when you
14    would have received it, because it's not signed
15    off on.  So my question to you is:  Regardless
16    of -- and it looks to be consistent, because
17    you've got the same duties, answer telephone,
18    greet office visitors, determine nature of call
19    or visit, you know, that first bullet point.  I
20    guess the bottom line is, your job didn't change
21    in terms of what you described early in the
22    deposition that was in the Complaint that you
23    added to, that you were still doing the same
24    function, but now you're doing it in the Bureau
25    of Water Quality; is that correct --

Page 87

1  A  Pretty much.
2  Q  -- generally?  Any differences that you recall?
3  A  No.  I guess not...
4  Q  Same kind of job, or same job and
5     responsibilities, and this was the secretary
6     position.  All right.
7        Now, I'm going to give you what will be
8     marked as Exhibit 13.
9        (WHEREUPON, Exhibit Number 13, March 21,
10    2018 email, was marked for identification.)
11 Q  All right.  So now we're -- this is going to be
12    March of 2018, and, "Linda has been approved for
13    FMLA for two separate conditions," so one of
14    these, again, could be COPD.  I have no idea
15    what the second condition is; do you?
16 A  I had to, I had to have some surgery done, and
17    during that surgery, it was supposed to be as an
18    outpatient, but they debated on whether or not
19    to let me go home because of my oxygen level.
20 Q  Okay.
21 A  I'm trying to remember, because I do believe
22    they did let me go home, but I ended up back in
23    the ER that night.
24 Q  Nothing you remember beyond the breathing,
25    pneumonia, COPD issues that would have called

Page 88

1     for giving you intermittent leave in 2018?  In
2     other words, when you went to the hospital,
3     whatever that was for -- do you remember what
4     that was for?
5  A  I had a hiatal hernia.
6  Q  Okay.
7  A  And they operated on me.
8  Q  And maybe that -- the recovery of that, you
9     would have to have intermittent time off.
10    Again, it's not -- what I have is this and we
11    don't know --
12 A  Right.
13 Q  -- unless you shared it with Rick, what that
14    was.  But I guess, my question to you was, any
15    dissatisfaction with the way this intermittent
16    leave was handled, as opposed to the previous
17    intermittent leaves?
18 A  No.
19 Q  Okay.  And do you recall talking with Rick at
20    all about what, what this was related to?
21 A  Yeah.  I mean, he and I discussed it after I got
22    back to work.
23 Q  Okay.  So in the --
24 A  Because I, I felt like he deserved an
25    explanation.

Page 89

1  Q  So that would have been the COPD.  Did he know
2     you had COPD prior to this?
3  A  He knew, yeah, he knew that I had COPD.
4  Q  He may not have known about the surgery or the
5     reason for that?
6  A  And then I told him about the surgery.
7  Q  Okay.  But you didn't have any problems with him
8     or otherwise --
9  A  No.
10 Q  -- as a result of the surgery --
11 A  No.
12 Q  -- or the leave; correct?
13 A  No.
14 Q  So that would be yes, correct?
15 A  Yes.
16 Q  All right.  When you see the transcript,
17    sometimes these things get confusing.  All
18    right.
19       Let me hand you another performance
20    appraisal.  This will be marked as Exhibit 14.
21       (WHEREUPON, Exhibit Number 14, Performance
22    Appraisal - August 2, 2018, was marked for
23    identification.)
24 Q  All right.  This looks to be a review that you
25    received in August of 2018.  Is that your

Page 90

1    signature on the last page?
2  A  Yes.
3  Q  And this gives you even a higher rating of 86.9,
4     and no specific areas needing improvement.  Take
5     a look at it, see if, if you agree with me.
6     This is a pretty good review.
7  A  I'm sorry.  What?
8  Q  Take a look at this review, is there anything
9     about this to you that doesn't seem fair or
10    accurate?
11  A  No.
12  Q  He's giving you outstanding now in certain
13    categories; correct?
14  A  Yes.
15  Q  All right.  So again, no disagreement or problem
16    with this review; correct?
17  A  No.
18  Q  All right.  This will be Exhibit 15.  This
19    relates to a wage increase, I think.
20        (WHEREUPON, Exhibit Number 15, Wage
21    Increase, was marked for identification.)
22  Q  So now we're looking at September of 2018.  Is
23    that your signature at the bottom of the page?
24  A  Yes.
25  Q  And this looks like a wage increase; does it

Page 91

1     not?
2  A  Yes.
3  Q  You went from 19.03 an hour to 19.28 an hour?
4  A  Yes.  When was this?
5  Q  This is in September of 2018.  So this would
6     have been a year before your termination, and a
7     couple months.  There's another -- let me give
8     you another increase.
9  A  Okay.  No, I know what it is.  Everybody got
10    that increase.
11  Q  Okay.
12  A  Well, let me put it this way --
13  Q  Yeah.
14  A  -- the Sanitary District changed the -- no.
15    There goes my memory.
16  Q  Let me give you another document that might
17    help.  We'll put them together, because there's
18    another increase that comes shortly thereafter.
19    And this will be Exhibit 16.
20        (WHEREUPON, Exhibit Number 16, Wage
21    Increase, was marked for identification.)
22  A  Longevity pay.
23  Q  Oh, Exhibit 15?  Or... so now we're talking
24    about three months later, you get another
25    increase?

Page 92

1  A  Okay.  The Sanitary District increased the
2     longevity pay for all the District employees.
3  Q  Okay.
4  A  Longevity is based on the number of years of
5     office.
6  Q  Sure.
7  A  And it depends -- and it says in the handbook,
8     depends on how many years you've been there as
9     to how much longevity pay you get.  Well, they
10    changed it, and that's what Exhibit 15 is.  That
11    was that increase.
12  Q  Okay.
13  A  So I'm not the only one that got an increase at
14    that point in time.
15  Q  Okay.
16  A  Okay?  And then in December, this increase would
17    have taken place in -- that would have been the
18    yearly increase, because they -- they gave us a
19    yearly percentage raise.  And I don't recall
20    what that was, but everybody in the Sanitary
21    District got, like, a 2 percent increase or a 3
22    percent increase or whatever.
23  Q  So neither of these increases reflected the
24    quality of your work?
25  A  No.

Page 93

1  Q  And one of the things I've noticed here is --
2     take a look at Exhibit 15, and this, this may be
3     inconsequential, but you see your title in
4     September is secretary.  And then when I look at
5     it in December, it looks like office manager,
6     and I know you went back and forth in those two
7     functions.  But does that have anything to do
8     with this?
9  A  It could, but -- no, I'm going to say no,
10    because the title --
11  Q  It never meant anything?  It kept going back and
12    forth, it looks like?
13  A  Yeah.
14  Q  All right.
15  A  I signed -- the job I signed up in water quality
16    was office manager.  Then it was later said that
17    I was to take it off my emails and put
18    "secretary."  Fine.  No problem.  Whatever.  I
19    don't care.  Whatever.
20  Q  So it didn't matter?
21  A  No, it didn't.
22  Q  Distinction without a difference?
23  A  Yeah.
24  Q  Gotcha.
25  A  I mean, it was just, you know...

Page 94

1  Q  Same job, same pay?
2  A  Yeah.  Exactly.  That's like in sanitation,
3     they've got an office manager.  She does the
4     same functions.
5  Q  As the secretary?
6  A  Uh-huh.
7  Q  Got it.  That's yours.  Or that's actually,
8     ultimately, going to be Tracy's.
9  A  Well, I'm trying to keep them, trying to keep
10    them in order for you.
11  Q  I know.  All right.  This will be Exhibit 16,
12     maybe -- 17.
13        (WHEREUPON, Exhibit Number 17, Donation of
14     Hours, was marked for identification.)
15  Q  Now, this, Exhibit 17, those are your -- that's
16     your signature at the bottom of both pages;
17     right?
18  A  Yes.
19  Q  And let's look at the time frame here, the first
20     page is in, in April of 2019.
21  A  Uh-huh.
22  Q  Second page is in May of 2019.  This looks like
23     at least a couple of weeks off that might have
24     been, might have -- you might have borrowed or
25     somebody might have extended you their sick

Page 95

1     time?
2  A  Yes.
3  Q  How did that work?  Do you remember?
4  A  If, if a Sanitary District employee runs out
5     of -- exhausts all of their extended -- all
6     their time --
7  Q  Right.
8  A  -- the extended time --
9  Q  Right.
10  A  -- then another employee of the Sanitary
11     District can donate up to, I think it's 80
12     hours, no less than 40, but no more than 80, and
13     then they have to have 80 remaining hours, in
14     their extended sick bank, in other words they
15     can't exhaust their sick bank to give to
16     somebody else --
17  Q  Okay.
18  A  -- that way, if employees are off and need a
19     paycheck, then if, if people want -- other
20     employees want to donate time, they can if they
21     have it.
22  Q  So by this point, you would have exhausted your
23     extended sick leave --
24  A  Yes.
25  Q  -- and to prevent you from going into vacation

Page 96

1     time --
2  A  No.
3  Q  No?
4  A  Because you have to exhaust all your time.
5  Q  Okay.  Let's take a look at the handbook so
6     we're all on the same page, because I know it's
7     in there.  That's going to be back to Exhibit 3,
8     and see if I can find it first, there.
9  A  I used to know this back and forth.
10  Q  Yeah.  I've dealt with this before.  It looks
11     like Page 18, "Sick Leave Bank," page 18 to 20,
12     let's take a look here.  So it looks like at the
13     end of 4.4 on Page 21, just what you were
14     talking about.  Do you see right before 4.5, it
15     says, "The District allows employees to assign
16     their sick leave bank benefits to other District
17     employees"?
18  A  Yes.
19  Q  So these would be the rules you're talking
20     about, aren't they?  "The employee assigning his
21     or her sick leave bank benefits must maintain a
22     balance in their own sick leave bank of 160
23     hours.  The employee assigning his or her sick
24     leave bank benefits must assign those benefits
25     in increments of 40 hours.  The assignment must

Page 97

1     be noted on a Personnel Information Form, and
2     signed by both the employee and the department
3     head.  Prior to the Personnel Information Form
4     being processed to the HR department, the
5     District administrator must approve the
6     assignment.  And only sick leave bank benefits
7     may be assigned to another employee.  Vacation
8     and personal days may not be assigned to another
9     employee."
10        So I think it's just what you had said.
11     You had exhausted your sick leave bank, and you,
12     you wouldn't have been paid if other employees
13     had not contributed to your --
14  A  Exactly.
15  Q  -- time off.  Okay.
16        And do you recall, when we looked back at
17     Exhibit 17, this suggested you would have at
18     least been off two weeks?  Because you got 40
19     hours from Chuck --
20  A  Yes.
21  Q  Who is Chuck?
22  A  That may, that may have been when I had the
23     surgery, because I was off, because it was
24     supposed to be a simple surgery, but it wasn't.
25     I mean, it, it ended up turning out to be more

Page 98

1    than simple surgery.
2  Q   This was not the -- there was a point at which
3    you fell and --
4  A   That was later.
5  Q   That was later.  We'll get to that.
6  A   That was in September.
7  Q   Okay.  So who is Chuck?
8  A   Chuck Jones.
9  Q   Yeah.  Who is that?
10  A   He works in the lab at the Bureau.
11  Q   And then, of course, Rick Conrad gave you time?
12  A   Yes.
13  Q   Okay.  Which I think -- I mean, does he get
14    to -- I assume he made that decision himself --
15  A   Yes.
16  Q   -- to give you that time --
17  A   Yes.
18  Q   -- which also is consistent with having a pretty
19    good relationship with each other; wouldn't you
20    agree?
21  A   Yes.
22  Q   Okay.  And when -- how much leave time would you
23    have gotten each year?  Do you know?  That you
24    would have exhausted by this point in 2019?
25  A   Well, I had 25 vacation days.

Page 99

1  Q   And then --
2  A   And 12 sick/personal days.
3  Q   Okay.
4  A   And then you accumulate .6 each pay, of
5    sick/personal or extended sick time.
6  Q   Okay.  So you, you had used quite a bit of time
7    by this point; correct?
8  A   Uh-huh.
9  Q   You got to say "yes."
10  A   Yes.  I'm sorry.
11  Q   That's all right.  At, at -- who, who would have
12    been performing your job when you were off like
13    this?  Do you know even?
14  A   No.  I'm not sure.
15  Q   Okay.
16  A   Probably Jill, but I don't know.
17  Q   That's Jill Harris?
18  A   Harris.
19  Q   Okay.  Okay.  When you would come -- when you
20    came back to work, were things in order for you?
21    In other words, you didn't have a huge backlog
22    of things to do?
23  A   No.
24  Q   Okay.  So let me give you your next performance
25    evaluation, marked as Exhibit 18.

Page 100

1    (WHEREUPON, Exhibit Number 18, Performance
2    Appraisal - August 12, 2019, was marked for
3    identification.)
4  Q   Many people cringe when they get their
5    evaluations during the course of these
6    depositions, but yours are pretty solid; aren't
7    they?
8    This one is in August of 2019.  Is that
9    your signature on the last page?
10  A   Yes.
11  Q   All right.  And would you agree this is another
12    very good review?
13  A   Yes.
14  Q   Okay.  Any issues or concerns with this review?
15  A   No.
16  Q   Now, as, as we get to the allegations of the
17    claim, we're going to be looking for evidence of
18    who discriminated or might have discriminated,
19    and why.
20    Would you agree with me that, at least
21    based on this review, and the fact that Rick
22    Conrad had just given you the 40 hours of
23    extended sick leave, there's nothing about Rick
24    that would suggest to you that he was
25    discriminating against you based on your

Page 101

1    disability or based on your age or based on your
2    use of FMLA time?  Would you agree with that?
3  A   Yes, I would agree with that.
4    THE WITNESS:  Can we take a break?
5    MR. SWIDER:  Yes.  Absolutely.
6    (A short recess was had.)
7  BY MR. SWIDER:
8  Q   All right.  So we just looked at Exhibit 18.
9    And let's look at Exhibit 19.
10    (WHEREUPON, Exhibit Number 19, October 10,
11    2019 email, was marked for identification.)
12  Q   Which is in October of 2019, and may not have
13    been anything you've seen before, Linda, so
14    let's look at this.
15    All right.  So this looks like -- now,
16    we're in October of 2019, Linda --
17  A   Uh-huh.
18  Q   -- and this must be related to your accident?
19  A   This -- yeah.
20  Q   Okay.  What happened?
21  A   In September, I fell at home and broke my femur
22    and my -- cracked my pelvic bone and was off
23    while I was admitted to the hospital.  Then I
24    was in the hospital for a week and then I was in
25    a nursing home for a while.

1 Q   Okay.  And were you off for six weeks or was
2    that just what was expected?  "Her latest
3    physician's statement said she'll be" --
4 A   Oh, darn.
5 Q   -- "off for six weeks."
6 A   I know I was off for a while, a good while, but
7    I don't think I was off -- I don't remember if I
8    was off for six weeks or not.  I know when I
9    went back to work, I was -- I went back to work
10    with my walker.
11 Q   Okay.
12 A   And it was a good thing I worked at Waterfall
13    because they have an elevator.
14 Q   Yeah.  I can't image.  The femur, that's got to
15    be pretty bad.
16 A   That's the bone from your knee to your --
17 Q   To your pelvic bone.  Did you fall off of
18    something?
19 A   No.
20 Q   You need a better story.  You were cleaning the
21    gutters?
22 A   No.  I just tripped and fell, tripped on an item
23    of clothing, thanks to my new dog.
24 Q   Oh, the dog.  Well, that's at least a good
25    thing.  All right.

1      This looks like you did get more donations.
2    Let me look at that.  All right.
3      This will be Exhibit 20.
4      (WHEREUPON, Exhibit Number 20, Donation of
5    Time, was marked for identification.)
6 Q   All right.  So is that your signature -- oh, no,
7    "unable to sign."  You may not have even been at
8    work?
9 A   Yeah.  I wasn't at work.
10 Q   Who is Tom?  It looks like you were getting more
11    donated time, extended sick time from this, in
12    this case, Tom Noble and Terry Rickert.  Who are
13    these two?
14 A   Terry Rickert and Tom both worked at sewer
15    maintenance prior to going to sanitation.
16 Q   So would these be co-employees?
17 A   Yes.
18 Q   Okay.  And it looks like, at least when Sarah
19    Beach is discussing this, she says, "I need to
20    inform her when the FMLA leave will be
21    exhausted" -- oh, I'm sorry.  It's the next
22    paragraph.
23      "I also need to let her know she's out of
24    extended time, and unless there's a donation, we
25    will start to use her vacation until she had 40

1    hours of time remaining."
2      So did you maybe use vacation time as well
3    as get the extended leave to make it last for
4    the number of weeks you were out?  Because you
5    were probably out more than two weeks; right?
6 A   Yes.
7 Q   Okay.  And then, you wouldn't know who was
8    performing your job while you were gone; right?
9    I mean, it may have been Jill Harris?
10 A   It may have been.
11 Q   You don't know?
12 A   Yeah.  I do not know who for sure.
13 Q   Okay.  Got it.  And then it looks like you were
14    able to come back to work without restrictions,
15    and this will be Exhibit 21.
16      (WHEREUPON, Exhibit Number 21, Central
17    Indiana Orthopedics letter - November 7, 2019,
18    was marked for identification.)
19 Q   So, have you seen this document before?
20 A   Pardon?
21 Q   Have you seen Exhibit 21 before?
22 A   Yes, I had to take it to work.
23 Q   Okay.  So did you return to work on November the
24    4th?
25 A   If that was a Monday, yes.

1 Q   Okay.  Let's take a quick look at what it is.
2    Yep, November 4th, 2019 would have been a
3    Monday.
4 A   Okay.
5 Q   Okay.  So that's -- that sounds about right to
6    you --
7 A   Yes.
8 Q   -- or looks right?
9      And you came to work with no restrictions;
10    right?
11 A   Yes.
12 Q   So you had healed pretty well?  That's great.
13    You didn't have -- or you did have a walker,
14    though?  Or not?
15 A   Yes.  Or my cane one or -- I went from one
16    back --
17 Q   Oh, right.
18 A   -- one or the other.  I had a walker and a cane,
19    so...
20 Q   Okay.  And neither one impacted your job
21    performance or ability to perform your job;
22    correct?
23 A   No.
24 Q   All right.  So when you came back to work, after
25    having taken the time off and the FMLA time off,

Page 106

1   the -- you were -- were there any ramifications
2   to that? Were people mad at you? Were there
3   any problems that you detected at the time you
4   came back to work related to your time off?
5 A   Not that I was aware of.
6 Q   Okay. All right. So let's move to the
7   elimination of your job.
8 A   Okay.
9 Q   I'm going to hand you what will be Exhibit 22.
10      (WHEREUPON, Exhibit Number 22, Position
11   change notice, was marked for identification.)
12 Q   You may not have seen this before, but it looks
13   like a notice, an internal notice or document
14   related to the termination of your position with
15   the District. And is that signature -- you may
16   have seen it enough to know if that is Bill
17   Smith's, the first signature? Or maybe somebody
18   signed it for him? I'm not sure.
19 A   Yeah. I'm not sure either.
20 Q   Okay.
21 A   I believe the "MH" is Megan Huff, is her
22   initials. I'm not sure, but I --
23 Q   Right. May have been she signed it for him or
24   they both may have signed it?
25 A   I don't know.

Page 107

1 Q   And then, is that Conrad's signature?
2 A   I think so. I don't know. I think it is.
3 Q   I think it is.
4      MR. SWIDER: If you can nod your head yes
5   or no...
6      MR. CONRAD: It is.
7      MR. SWIDER: Yeah, it looks like it. All
8   right.
9 Q   And I -- now, I assume this came as a total
10   surprise to you, that when, when you were
11   notified of the --
12 A   Yes.
13 Q   -- elimination?
14 A   Yes.
15 Q   And tell me what you recall happening. I know
16   you've written it out, both in your charge, and
17   probably, you know, and in the Complaint, but
18   just, how did that day unfold for you, of the
19   termination?
20 A   I mean, I went to work just like normal, and
21   then Bill Smith and someone else came into the
22   office.
23 Q   Did you not -- was that Mark McKinney -- I'm
24   sorry. No.
25 A   Yeah.

Page 108

1 Q   But you didn't know who that was?
2 A   Exactly.
3 Q   Okay.
4 A   I had --
5 Q   So he comes in with somebody you don't know?
6 A   Yes. And they want -- Bill wanted to see Rick,
7   so I got up and I went into Rick's office and
8   told him that Bill was with someone else and
9   wanted to see him, and Rick come out and they
10   went, you know, they went into Rick's office.
11   And then Rick come out and said they wanted to
12   see me.
13      So I went in and we closed the door and
14   then Bill proceeded to say that -- he proceeded
15   to tell me that he -- they were doing away with
16   the position. And, at one point, I stopped him
17   and I asked him who the other gentleman was
18   because I didn't know who he, who he was. And
19   he said, "Well, that's Mark McKinney."
20      And I said, "Okay."
21      And so he -- Bill Smith said they were
22   doing, they had done some studying and that my
23   position wasn't the only one they were going to
24   be doing away with, and that they were going to
25   do away with my position. And I asked him,

Page 109

1   "Why?"
2      And he said, "For cost effectiveness."
3      And I just said, "Okay." I didn't say much
4   of anything else because, I mean, that was like
5   a gut punch --
6 Q   Right. Right.
7 A   -- you know, and so anyway, we, you know, kind
8   of -- I don't even remember exactly what was
9   said after that, but he did give me an option.
10   He told me I could retire or do what Nancy did.
11 Q   And that was where you thought that meant take a
12   laborer's job; right?
13 A   There was no thinking about it. That's the
14   option they gave her, was to terminate her
15   employment or take a janitor's position. There
16   was nothing -- I mean...
17 Q   But how did you know that?
18 A   Because I was in that department when it
19   happened.
20 Q   Okay. So this is Nancy, who? Nancy Williams?
21 A   Williams.
22 Q   And what was her job?
23 A   At the time, she was the assistant
24   superintendent of sewer maintenance.
25 Q   And was this close to the time that your

Page 110

1    elimination occurred?  Or do you remember?
2  A   No.  It was quite a few years --
3  Q   Before that?
4  A   -- before that.
5  Q   Okay.  And you're under- -- were you in the room
6      when Nancy Williams was apprised of her job
7      elimination?
8  A   No, I was not.
9  Q   Okay.  And so where did you come away with an
10     understanding of her having been offered this
11     janitorial position?
12  A   That's exactly what she told me.  And I was also
13     informed by another, at the time, supervisor,
14     that was in the room at the time.
15  Q   Who was that?
16  A   Steve Bowman, who they eliminated totally.
17     Because of his position, they, they could do
18     away with him.  I mean, you know, he wasn't --
19     he has a salaried employee and politics changed.
20     They wanted to change management, so
21     therefore --
22  Q   Bowman's position was eliminated?
23  A   Well, no.  They just did away with Bowman and
24     put their own person in his position.
25  Q   That's a different issue?

Page 111

1  A   Yes.  I mean, but --
2  Q   Nancy Williams --
3  A   -- Nancy's position was --
4  Q   Was eliminated?
5  A   -- assistant superintendent, and no.
6  Q   Okay.
7  A   They replaced her with someone else.
8  Q   Okay.
9  A   But they gave her the option to either retire or
10     take a janitor's position.
11  Q   And she told you that?
12  A   Yes.
13  Q   Okay.  Bowman confirmed that?
14  A   Yes.
15  Q   Was Bowman in the room --
16  A   Yes.
17  Q   -- during the termination?
18  A   Yes.
19  Q   All right.  So if that -- if those were the
20     choices you had, to retire or take a janitor's
21     position, you said, "I'm not going to do either
22     one," or how did you respond?
23  A   No.  And, and he gave me three days to contact
24     him.
25  Q   "He" is Bill; right?

Page 112

1  A   Bill Smith --
2  Q   Right.
3  A   -- gave me three days to contact him.  Well, I
4      contacted an attorney.  Then when I went to talk
5      to Bill, or asked to talk to Bill, he wouldn't
6      talk to me.
7  Q   Because he knew --
8  A   Apparently, he already knew I talked to an
9      attorney.  But that's, you know, neither here
10     nor there.  If he would have talked to me, we
11     might not be sitting here right now.
12  Q   Okay.
13  A   But at 71 years old, no, I was not going to take
14     a -- I mean, and with COPD, there's no way I
15     could take a janitor's job.
16  Q   Right.  Did you -- so you really didn't have a
17     discussion at the time as to what that meant,
18     because the comment was, you could do what Nancy
19     did; right?  Or be -- what was the comment where
20     you could take the option and Nancy's job offer
21     because she didn't take it?
22  A   That I could retire or do what Nancy did.
23  Q   But Nancy did not -- did she take -- she didn't
24     take a janitor's job?
25  A   She did take the janitor's position for a short

Page 113

1      period of time before she got her stuff together
2      and then did retire, but she was a lot
3      younger --
4  Q   I gotcha.
5  A   -- when that all happened --
6  Q   Okay.
7  A   -- so...
8  Q   Okay.  So the next thing that you do, given that
9      you had to -- I mean, you had to believe this
10     was unfair --
11  A   Yes.
12  Q   -- right?  And you wouldn't really know why it
13     happened.  I mean, you're told that the job was
14     no longer necessary, but -- and you're thinking
15     there could be more to it than that?
16  A   I don't know.
17  Q   Right.
18  A   I mean...
19  Q   You wouldn't know?
20  A   Yeah.  I mean, I have no idea.
21  Q   Okay.  So you go to a lawyer --
22  A   Uh-huh.
23  Q   -- and, and you can answer that.  I'm not going
24     to ask you anything that was said, because you
25     have privilege with the lawyer, but was the

1   lawyer Aaron?
2 A  No.
3 Q  Okay.  This was another lawyer.  Okay.  Who was
4   that?
5 A  That was -- it was the one in Muncie.
6 Q  Okay.
7 A  And he advised me to file --
8     MR. WILLIAMSON:  Stop.  Stop.
9 Q  No.  You don't have to say that.  Yeah.  You
10   have lawyer/client privilege --
11 A  Okay.
12 Q  -- so what we can't talk about, I don't want you
13   to tell me --
14 A  Okay.
15 Q  -- is what you talked about with your lawyer.
16 A  Sure.
17 Q  But you can give me the name of the lawyer and
18   you can give me when it occurred --
19 A  Okay.
20 Q  -- but not anything behind it, but anyway --
21 A  I'm going to have to think because --
22 Q  That's okay.  You went to a lawyer in Muncie?
23 A  Yes.
24 Q  And then was that the point at which you filed a
25   civil rights charge?  Or did you file that after

1   you saw Aaron?  Do you remember?
2 A  No.  I filed after I talked to the attorney in
3   Muncie.
4 Q  Muncie, okay.  So, so this is the civil rights
5   charge.  Let's take a look at that.  And that is
6   what will be marked as Exhibit 23.
7     (WHEREUPON, Exhibit Number 23, Charge of
8   Discrimination, was marked for identification.)
9 Q  All right.  It looks like this got filed, or at
10   least signed by you on December the 12th.  Do
11   you see that at the bottom?
12 A  Yes.
13 Q  And it looks like you digitally signed it, which
14   is certainly the way things are happening these
15   days of COVID.  And did you have an opportunity
16   to review this charge before you filed it?  Or
17   before -- yeah, before you signed and filed it?
18 A  Yes.
19 Q  Okay.
20 A  I believe I was -- I did.
21 Q  Okay.  And at this point, again, you were
22   represented by a lawyer, another lawyer in
23   Muncie; right?  Other than -- this was not
24   Aaron?
25 A  I mean, right.  I mean, he wasn't representing

1   me.  He just told me what I should do, I guess.
2 Q  Okay.  So, okay.  Let me ask this:  Did you go,
3   then, to the Indiana -- to the -- did you call
4   the EEOC?  How did you, how did you get this --
5   did you fill this out yourself, or did the EEOC
6   help you?
7 A  I called EEOC and they told me to do it online.
8 Q  Okay.  And then you filled it out yourself?
9 A  (Nods.)
10 Q  So this would be your language in the charge?
11 A  Yes.
12 Q  Okay.  And you see that this charge is filed
13   against the City of Muncie?  Do you see that?
14 A  (Nods.)
15 Q  You're shaking your head "yes"; right?
16 A  Yes.
17 Q  All right.
18 A  I'm sorry.
19 Q  And, and as you know, you worked for the Muncie
20   Sanitary District; correct?
21 A  Yes.
22 Q  All right.  Then let's look at the allegations,
23   and let's make sure we've covered today, you
24   know, anything that gave you reason to believe
25   that you were discriminated against or

1   terminated based on, in this case, your
2   disability and your age.  And I don't know what
3   "other" is.  It might have been a reference to
4   FMLA.
5     Do you see the boxes?  You've got the age
6   box checked and the disability box checked and
7   then you see where you have the "X" under
8   "other"?  Do you know what that related to?
9 A  No.
10 Q  Maybe FMLA, I don't know.
11 A  I don't know.
12 Q  Okay.  "My most recent position was office
13   manager" -- "manager for the Muncie Sanitary
14   District and my direct supervisor was Rick
15   Conrad.  On November 5th, 2019, District board
16   president, Bill Smith, and Sanitary District
17   Attorney Mark McKinney came to my office and
18   said they wanted to speak with Rick.  I showed
19   them to Rick's office and shortly afterwards,
20   Rick came out and said they wanted to speak with
21   me.  Bill then advised me that the City was
22   eliminating my job and gave me the option to
23   retire or do what Nancy did.  I understood this
24   to retire or become a laborer, as that is what
25   was offered to former coworker, Nancy Williams."

Page 118

1    So you've already testified to that;
2  correct?
3  A   Yes.
4  Q   "Rick and Bill knew that working as a laborer
5    was out of the question in my case, and they are
6    aware I am 71 years old and have disabilities
7    and therefore knew I would have no option but to
8    resign."
9      And you already said they knew you were 71
10   years old, which would have made it hard to be a
11   laborer.
12     "And have disabilities," and when you say
13   "have disabilities," you're relating to COPD?
14  A   Yes.
15  Q   Are you relating any other disability?
16  A   No.
17  Q   Okay.  "And therefore, I had no option but to
18   resign."  Okay.  "During the meeting, I was
19   informed that the City is also eliminating the
20   position of billing department.  This position
21   is also held by an employee over the age of 50."
22     Who was that referencing?
23  A   They didn't -- as far as I know, they didn't
24   eliminate anybody.
25  Q   Okay.  But they told you they were?

Page 119

1  A   Yes.
2  Q   Okay.  Were you aware of an individual by the
3    name of Dan Hilbert?
4  A   Yes.
5  Q   Do you know whether his job was eliminated or
6    not?
7  A   Yes.
8  Q   Was it eliminated?
9  A   Yes.
10  Q   And do you know anybody in the position of the
11   assistant superintendent of sewer maintenance?
12  A   Yes.
13  Q   Who was that?
14  A   Doug Marshall.
15  Q   And do you know whether his position was
16   eliminated?  And you may not.  I mean -- you
17   know something?
18  A   You're right.  I do know something.
19  Q   What is that?  I get to ask you.  And this was
20   the Doug Marshall we talked about before?
21  A   Yes.  Yes.
22  Q   Tell me what you think or know happened.
23  A   I don't know that -- I don't know if they did
24   away with the position or not.
25  Q   Okay.

Page 120

1  A   I know they moved him to another department.
2  Q   So they didn't let him go?
3  A   No.
4  Q   Okay.  And do you have any idea how old Hilbert
5    was?
6  A   I'd say he's in his 50s, 60s.  50s, I'd say.
7  Q   Does he have -- well, yeah.  When you're
8    referring to someone over the age of 50, you're
9    referring to Hilbert?
10  A   Yeah.
11  Q   Okay.  And did he have any disabilities of which
12   you're aware of?
13  A   Not that I'm aware of, no.
14  Q   Did he file FMLA --
15  A   I have --
16  Q   -- leave?
17  A   I do not know.
18  Q   Okay.  Now, after you filed the charge, which is
19   Exhibit 23, did you have further contact or any
20   contact with anybody from the EEOC?
21  A   Yeah, but I don't recall the name.
22  Q   Okay.  Let's see here.
23     (WHEREUPON, Exhibit Number 24, Response to
24   Position Statement, was marked for
25   identification.)

Page 121

1  Q   Have you seen, or can you tell us what Exhibit
2    24 is?
3  A   Yes.  I've seen this.
4  Q   Okay.  Is this -- did you submit this to the
5    EEOC?
6  A   Yes, I did.
7  Q   Okay.  All right.  "So Mr. Smith is, in fact,
8    the president of the board of Sanitary
9    Commissioners and I do believe that he's 79
10   years of age."
11     So Bill is older than you; right?
12  A   Yes.
13  Q   "His position is a part-time position and his
14   position is appointed by the mayor."
15     Did you know that -- and I think you
16   probably did.  You may have said it here -- he
17   assumed Nikki's duties for some period of time
18   as an acting administrator; correct?
19  A   Yes.
20  Q   All right.  And so, in that capacity, was he
21   working full-time?  Or do you even know?
22  A   I do not know.
23  Q   Okay.  In their response, it says -- but, but
24   you do know that Bill was -- is older than you
25   are?

1  A   Yes.
2  Q   Okay.  In their response, it says "I was to
3      contact Nikki Grigsby of any wrongdoing or
4      discrimination.  I'm sorry.  But she's been on
5      administrative leave since her arrest by the FBI
6      and Bill Smith has assumed her duties as
7      District administrator."
8          So what you're saying there is what we said
9      at the beginning.  You've said -- beginning of
10     your testimony, "so my complaint mechanism would
11     have been the very person who fired me"?
12 A   Yes.
13 Q   Okay.  Because Nikki wasn't available at that
14     point?
15 A   Yes.
16 Q   All right.  "Our handbook is also a little
17     one-sided.  I have copies of prior handbooks
18     that were fair and equitable to the employer and
19     employees as well.  I can supply that, if
20     needed."
21         Have you fully testified to your
22     understanding of what this means today?
23 A   Yes.
24 Q   Okay.  Is there anything else you would add to
25     that?

1  A   No.
2  Q   Okay.  "There were other positions within the
3      District that could have been combined or I
4      could have been moved into and a younger person
5      would have been displaced."
6          What were you thinking of in terms of other
7      positions that you could have assumed?
8  A   Well, the job that --
9  Q   Sorry?
10 A   -- the job at the water, wastewater plant.
11 Q   What was that job?
12 A   Jill's job.
13 Q   Okay.
14 A   She's younger than I am, same job, or the job at
15     sewer maintenance.
16 Q   I'm sorry.  And her name is -- that's Jill
17     Harris; right?
18 A   Harris.
19 Q   Okay.
20 A   There's also a job at sewer maintenance that I
21     could have went into.
22 Q   And who had that job?
23 A   Well, at that time, it would have been either --
24     well, Haley was the younger employee.
25 Q   Kaley?

1  A   Haley, uh-huh, Millspaugh.
2  Q   These are both secretary, office manager
3      positions?
4  A   Yes.
5  Q   Okay.  Any, any others that you're referring to
6      here or would otherwise mention at this time?
7  A   Tammy Branson, sanitation.
8  Q   Who is this?
9  A   Tammy Branson at sanitation.  They were all
10     younger than I am, and they were all doing the
11     same things.
12 Q   Anyone else?
13 A   Can't think of what her first name is.  Shoot.
14 Q   That's all right.  If you come up with it, just
15     tell Aaron and he can pass it on to us.
16 A   Okay.
17 Q   Okay?  I mean, the bottom line is what you're
18     saying is, there were younger people who hadn't
19     been there as long as you, in comparable
20     positions elsewhere and they could have been --
21     as your job was eliminated, they could have been
22     bumped or taken out of their role?
23 A   Yes.
24 Q   Now, having a union would have guaranteed you
25     probably that kind of right --

1  A   Probably.
2  Q   -- right?  Because you're familiar with bumping
3      procedures --
4  A   Yes.
5  Q   -- based on seniority in a union environment --
6  A   Yes.
7  Q   -- right?  Is there any policy you're aware of
8      in the handbook that would have had a similar
9      impact?  In other words, a bumping-type
10     procedure in the handbook?
11 A   Not anymore.
12 Q   Okay.  There might have been at some point?
13 A   Yes.
14 Q   Okay.  Since the time that it's been taken out
15     of the handbook, are you aware of any bumping
16     situations that occur at the District?
17 A   No.  I'm not aware of anybody's job being done
18     away with either.
19 Q   Okay.  That doesn't mean it didn't happen.
20     You're just not aware of it, or you're sure it
21     never happened before?
22 A   Pretty sure it never happened.
23 Q   All right.  So in, in the context of your age
24     discrimination claim, what gives you reason to
25     believe that you were discriminated based on

Page 126

1  your age, is that younger people in other
2  comparable positions were retained while you
3  were let go?
4  A  Yes.
5  Q  Is there anything else that gives you reason to
6     believe that your -- you were terminated based
7     on your age?
8  A  No.  That would -- that's pretty much it.  I
9     mean...
10 Q  Okay.  And did it make any sense to you that --
11    companies and cities can only act through their
12    employees.  So when we say that in the charge,
13    the City of Muncie discriminated against you
14    based on your age, that means people had to have
15    done that.
16       So in this instance, would you be saying
17    that Bill Smith discriminated against you based
18    on your age?  Or do you not know?
19 A  My employer.
20 Q  Your employer?
21 A  And with him being the board president, and
22    District administrator at the time, puts him in
23    the position -- I mean, he, you know, he's in
24    the position of hire and fire or whatever.
25 Q  Okay.  So we talked about this earlier.  There's

Page 127

1  nothing that you have in the way of information
2  that would suggest to you that Rick Conrad
3  discriminated against you based on your age?
4  A  No.
5  Q  Okay.  So if -- and again, there may be more
6     people involved than you know and the discovery
7     process is ongoing, but at this point, the
8     person you would say who discriminated against
9     you based on your age would be at least Bill
10    Smith?
11 A  Yes.
12 Q  Okay.  And from your standpoint, you don't know
13    what role Mark McKinney had in this at all,
14    other than he was in the meeting with you when
15    you were terminated?
16 A  He was their attorney.  That's all I know.
17 Q  Right.  Who -- I can tell you, we generally
18    don't have a decision-making role for our
19    clients, but you don't know whether he was part
20    of the decision or not?
21 A  Exactly.
22 Q  All right.  And you don't know to what extent
23    Rick was a part of the decision, if any?
24 A  Exactly.
25 Q  So that would be the basis for your claim that

Page 128

1  you were discriminated against based on your
2  age.  What would be the basis for your
3  conclusion that you were discriminated against
4  based on your disability?  Anything different
5  or...
6  A  Just other than what I had to go through when I
7     was in the other department with my
8     concentrator.  I don't know if anybody else had
9     to go through that or not.
10 Q  All right.  But who would have been involved in
11    that decision?  Would that have been --
12 A  That would have been --
13 Q  Terry?
14 A  -- Tracy or Doug or the board or I don't know.
15 Q  But you don't know --
16 A  For sure, no, I don't.
17 Q  -- about that?
18       Now, the three people that you mentioned,
19    and there may be a fourth, who had jobs like
20    yours, did any of them have disabilities that
21    you're aware of?
22 A  The comparable positions, no, not, not that I'm
23    aware of.  I'll put it --
24 Q  Right.  They --
25 A  -- that way.

Page 129

1  Q  -- could have had disabilities?
2  A  I know that Jill had knee replacement --
3  Q  Okay.
4  A  -- but I don't know how much of a disability or
5     if -- you know, I don't dig into their medical
6     histories.
7  Q  Right.  Right.  So from your perspective, at
8     least, again, it might come out through
9     discovery, you're not aware of whether they had
10    disabilities or not?
11 A  Right.
12 Q  Okay.  Or whether they were regarded as having
13    disabilities or not, even if they didn't have
14    disabilities?
15 A  Right.
16 Q  And then with respect to FMLA, being retaliated
17    against for that, we talked about, at least
18    during the course of your deposition, you didn't
19    think any of that occurred.  Is there anything
20    else that -- is there anything that suggests to
21    you that you were being retaliated against based
22    on your FMLA leaves?
23 A  Not that I'm aware of.
24 Q  Okay.  And again, that might come out through
25    discovery, and sometimes it can even relate to

Page 130

1 timing. But there's nothing that you're aware
2 of that would suggest to you, at this point,
3 that you were discriminated against or
4 retaliated against based on your using FMLA
5 time; is that correct?
6 A  Right.  Yes.
7 Q  Okay.  Do you recall receiving a decision from
8 the Equal Employment Opportunity Commission in
9 response to your charge?  In other words, did
10 the EEOC -- do you know whether they made any
11 finding?
12 A  I don't remember.  I just know that they sent me
13 a letter giving me -- telling me I had a right
14 to sue.
15 Q  Got it.
16 A  So I don't know.
17 Q  All right.  Let me hand you what is marked as
18 Exhibit 30.
19    COURT REPORTER:  That would be Exhibit 25.
20    MR. SWIDER:  That's because my 24 looks
21 like a 29.
22    (WHEREUPON, Exhibit Number 25, Dismissal
23 and Notice of Rights, was marked for
24 identification.)
25 Q  All right.  Exhibit 25.  Do you remember seeing

Page 131

1 this?
2 A  Yes, I do.
3 Q  Okay.  And so, "The EEOC issues the following
4 determination based upon its investigation:  The
5 EEOC is unable to conclude that the information
6 obtained established violations of the statute.
7 This does not certify that the Respondent is in
8 compliance with the statutes.  No finding is
9 made as to any other issues that might be
10 construed as having been raised by this charge."
11    So at least, what you understood is that
12 they dismissed your charge, which then gave you
13 the right to bring a lawsuit?
14 A  Right.
15 Q  Okay.  And when it says, "No finding is made as
16 to any other issues," they wouldn't have
17 authority to decide the FMLA issue, if that had
18 been raised, but you don't recall whether you
19 raised that at the EEOC or not?
20 A  No, I do not.
21 Q  Okay.  And you can see at the bottom, this was
22 sent to the City of Muncie; do you see that?
23 A  That was because that's what I was told to do by
24 the EEOC.
25 Q  Okay.  So in other words, when you filed your

Page 132

1 charge against the City, that came from advice
2 through the EEOC?
3 A  Yes.
4 Q  Okay.  And do you remember who gave you that
5 advice?
6 A  No, I do not.
7 Q  Okay.  All right.  Let me hand you what will be
8 marked as Exhibit --
9 A  As I tried to explain to them they were two
10 different entities.
11 Q  Went in one ear and out the other?
12 A  Apparently.
13 Q  Okay.  All right.  Let me give you what's marked
14 as Exhibit 26.
15    (WHEREUPON, Exhibit Number 26, Indiana
16 Department of Workforce Development
17 Determination, was marked for identification.)
18 Q  Did you file for Unemployment Compensation
19 Benefits after your termination?
20 A  Yes, but not right away.
21 Q  Okay.  What happened -- why, why did you wait on
22 that?
23 A  Because I was told that I needed to wait, so I
24 did.
25 Q  Okay.  And were you told by a lawyer or...

Page 133

1 A  No.
2 Q  Okay.  Who -- where did you get that advice?
3 A  From someone -- and there, again, I didn't take
4 names, which I know better --
5 Q  Right.
6 A  -- but --
7 Q  Was this at Workforce Development, then?
8 A  Yes.
9 Q  Okay.  So --
10 A  And it was somebody on the phone.
11 Q  Well, let me ask you this:  There was a point at
12 which you did file for benefits?
13 A  Yes.
14 Q  Do you recall when that was?
15 A  I want to say that it was like in January,
16 January, February, maybe, but then I didn't get
17 anything until -- I didn't start receiving any
18 benefits until late in 2020.
19 Q  Did they make up the --
20 A  Yes.
21 Q  Okay.
22 A  They did.
23 Q  And at that time -- and let me just cut to the
24 chase on this, because I'm going to ask you more
25 questions about it, but it seemed to me that

Page 140

```
 1  A   -- and I was hired as an administrative
 2      assistant.
 3  Q   Okay.  Let me hand you, I think the
 4      documentation, communications relative to that,
 5      as Exhibit 27.
 6          (WHEREUPON, Exhibit Number 27, Ames
 7      Construction letter - November 23, 2020, was
 8      marked for identification.)
 9  Q   Is this the job you're talking about --
10  A   Yes.
11  Q   -- that you were offered?
12  A   Yes.
13  Q   Did you accept -- it looks like you accepted the
14      job?
15  A   Yes.
16  Q   And you would be making more there than you were
17      making for the District, if I read that right?
18  A   Yes.
19  Q   Okay.  And the benefits were comparable?
20  A   Yes.
21  Q   Did you -- how long -- are you still working
22      there?
23  A   No.
24  Q   What happened?
25  A   I got laid off because there wasn't enough work
```

Page 141

```
 1      for two administrative assistants --
 2  Q   Oh.
 3  A   -- so...
 4  Q   When did you get laid off?
 5  A   February the -- February 18th, I think.  I'm not
 6      sure.
 7  Q   Okay.
 8  A   But it was in February.
 9  Q   Have you been looking for work since then?
10  A   Yes.
11  Q   Okay.  What kinds of efforts have you made?
12  A   Same thing, online, through Workforce
13      Development in Muncie, with the COVID, not --
14      well, I can't say it's going down, because it's
15      coming back up now, but before, as it was going
16      down, but yes, I've looked and I have the
17      documents.
18  Q   All right.  If you would just give all that
19      to -- or make sure he has it all --
20  A   Okay.
21  Q   -- because part of your responsibility, and you
22      recognize it, is to mitigate your damages.  That
23      means you have to be out there trying to find
24      employment.  And let's see what this is.  Okay.
25          I'm going to hand you now what will be
```

Page 142

```
 1      marked as Exhibit 28, which would be your
 2      responses to our interrogatories.
 3          (WHEREUPON, Exhibit Number 28, Plaintiff's
 4      Answers to Defendant's First Set of
 5      Interrogatories, was marked for identification.)
 6  Q   Go over a few things there.  I think you've
 7      pretty much testified to anything and everything
 8      in this, but we'll take a look.  Do you
 9      recognize this document?
10  A   Yes.
11  Q   And is this your writing on the top
12      right-hand --
13  A   Yes.
14  Q   -- corner?  And you've looked at it and made
15      some changes; is that correct?
16  A   Yes.  Just in the spelling of --
17  Q   Jill Harris's name?
18  A   Yes.
19  Q   It was Jill Paris.  So on the second page,
20      you're asked to identify potential witnesses in
21      this, and I just want to go through and make
22      sure of any information you haven't already
23      passed on to me.  "Dan Hilbert has information
24      regarding plaintiff's employment and
25      performance, as well as defendant, Muncie
```

Page 143

```
 1      Sanitary District's policies and procedures."
 2          What do you think Hilbert has that would be
 3      relevant to your situation, specifically?
 4      Because he was let go; right?
 5  A   Yes.
 6  Q   Okay.
 7  A   And then -- yes, that's all I can say.
 8  Q   Any information that he would add to your claims
 9      that you're aware of now?
10  A   No, not that I'm aware of.  I don't know if he
11      would add anything to it or not.
12  Q   How about Jill Harris?
13  A   I don't know about Jill, I don't know if she
14      would add to it or not.
15  Q   Grigsby?
16  A   I have no idea.
17  Q   Rick is here?
18  A   Uh-huh.
19  Q   And anything else that Rick might add, other
20      than the obvious, which is he was your
21      supervisor.  He was there when you were
22      terminated.  He gave you his reviews, you know,
23      we've gone through most of that.  Is there
24      anything else that Rick would be able to add?
25  A   I don't know.  I don't --
```

Page 144

1  Q   You're right.  And -- but you listed him and
2  these others as witnesses, you know.  It says,
3  "Identify all persons with knowledge or
4  information regarding any facts or allegations
5  in your Complaint.  Please identify the facts,"
6  and you've got a broad reference to it.  I just
7  want to be sure I understand that I'm not
8  missing anything.
9       In other words, from your standpoint, there
10  may be things that are -- develop in discovery,
11  but at this point, is there anything else that
12  any of these people would add to your claim?
13       In other words, confirm or give evidence
14  that you were discriminated against based on,
15  you know, your age, your disabilities, or your
16  FMLA filing?
17  A   I don't think so.
18  Q   Okay.  And that would be the same for Will-,
19  Bill Smith and John Barlow?
20  A   Yeah.
21  Q   So then you're asked specifically in
22  Interrogatory Number 7, which is on Page 4,
23  "Identify the facts and documents supporting the
24  allegation in your Complaint that defendant
25  retaliated against you for asserting your rights

Page 145

1  under the FMLA."
2       And I think -- oh, it looks like we have,
3  "Plaintiff worked for defendant for several
4  years.  During her tenure with defendant,
5  plaintiff submitted several FMLA leave requests.
6  Plaintiff's leave request documents are in the
7  possession, custody, and control of defendant.
8  These leave requests includes requests submitted
9  in March and September of 2019.  Defendant
10  terminated plaintiff's employment and had her
11  duties absorbed by employees she trained, and
12  who had not used FMLA leave as opposed to
13  terminating them and having their" -- "having
14  her absorb their duties."
15       Now, I understand that much of this is
16  often completed by the lawyer, because we do
17  that, and then you look at or read it before
18  it's submitted.
19       Is there any evidence, other than what
20  you've testified to today, that would suggest
21  that your FMLA exercise had anything to do with
22  your termination?
23  A   I don't know.
24  Q   Okay.  Okay.  And who are the employees that you
25  trained?

Page 146

1  A   Jill.
2  Q   Okay.  Anybody else that this references?
3  A   Kaley.
4  Q   Anybody else?
5  A   (Shakes head.)
6  Q   Okay.
7  A   No.
8  Q   Okay.
9  A   Sorry.
10  Q   No.  You're fine.  That's what I'm trying to get
11  at here.
12       Looking at Interrogatory Number 9, this
13  asks about people who were treated more
14  favorably than you, under similar circumstances,
15  and you said, "Based on information and belief,
16  Jill Harris is a non-disabled employee who is
17  much younger than I whose job was not
18  eliminated."
19       Any-, anything else that you would point to
20  here?  "Identify all other similarly situated
21  employees that you allege were treated more
22  favorably," anybody else that you would point
23  to, other than Jill?
24  A   Just the ones that I named earlier.
25  Q   Which would be Kaley and who was the -- there

Page 147

1  was a third person?
2  A   Tammy and --
3  Q   You didn't remember the fourth, but let me see
4  if that Tammy is what we have.
5  A   Her last name is Quackenbush.
6       (Court reporter clarification.)
7  Q   So those four, who were similarly situated, in
8  that they had the secretarial/office manager
9  functions, younger than you, less tenure than
10  you, don't know about their FMLA activity or
11  their disabilities, but their jobs remained,
12  while yours was terminated?
13  A   Yes.
14  Q   Okay.  Okay.  Now, Interrogatory Number 10, your
15  answer, "Plaintiff's employment was terminated
16  on or about November 10th, 2019.  Based on
17  information and belief, plaintiff's employment
18  was terminated based on her age, disability, and
19  her use of FMLA leave."
20       That's the heart of the case.  Have we
21  fully discussed in this deposition today all
22  facts that led you to this conclusion?
23  A   Yeah, I believe we have.
24  Q   Okay.  Then, let's see here, looks like in terms
25  of other income, you sold some Avon and shirts?

Page 148

1  A   31.
2  Q   Okay.  Is that a -- like, what is 31?
3  A   Tote bags and purses and...
4  Q   Okay.  All right.  I just want to go over with
5      you a few questions about the income again, so I
6      understand the nature of any claims for back
7      pay.  And I'm going to give you now, which I
8      think is consistent with what we discussed about
9      how much you were earning with the District,
10     Exhibit 29.
11         (WHEREUPON, Exhibit Number 29, Earnings
12     History Report, was marked for identification.)
13  Q   And what this purports to be -- and I'm pretty
14     sure you haven't seen it before -- is your
15     earnings for 2018 and 2019 with the District.
16     And if you look at the second page, the gross
17     wage for 2018 looks to be $39,722.40; do you see
18     that?
19  A   Yes.
20  Q   Is that, is that about right from your
21     understanding?
22  A   Yes.
23  Q   And then if you look at the last page, which
24     relates to the earning for 2019, which would
25     have been a month short or so, or almost two

Page 149

1      months, you got your last paycheck in December,
2      so less than that, again, about the same amount
3      $39,106.  You might have gone over $40,000 --
4  A   Yes.
5  Q   -- if you had worked out the year.  Does that
6      make sense to you?
7  A   Yes.
8  Q   Okay.  Now I'm going to hand you tax returns,
9      and we'll start with 2020.  And that's going to
10     be Exhibit 30.
11         (WHEREUPON, Exhibit Number 30, 2020 1040
12     U.S. Individual Income Tax Return, was marked
13     for identification.)
14  Q   Now, looking at this tax return, when you look
15     at the first page --
16  A   Third page?
17  Q   First page.
18  A   Oh, okay.
19  Q   Number 1, do you see halfway down, "Wages,
20     salaries, tips, attach W-2s," and this would
21     suggest that in terms of income from other
22     employment, you made only $2,829 in 2020.  Is
23     that accurate?
24  A   Yeah.
25  Q   As far as you're aware?

Page 150

1  A   I think so.  I'm...
2  Q   Okay.  And then it looks like you've got
3      pensions and annuities of $36,656.  Is that the
4      lump sum PERF monies that they gave you?  Do you
5      know what that is?
6  A   That would, that would have been a part of it,
7      yeah.  Yes.
8  Q   And then --
9  A   Because this is for 2019.
10  Q   It should --
11  A   2019, filed in 2020?
12  Q   No.  I think it's for 2020, so you're a little
13     bit ahead --
14  A   Okay.
15  Q   -- of the curve here if you've already got it
16     produced for last year, because it's not due
17     until May.
18  A   All right.  Well, then apparently it is just
19     my -- because I had to withdraw money out of my
20     pension to pay my bills, to help pay my bills.
21  Q   But that's -- if you add these two together, do
22     you see the social security benefits?
23  A   Yes.
24  Q   Which, when did you start drawings social
25     security?  Because you were eligible even while